626 So.2d 608 (1993)
Nancy Clay MADDEN
v.
Farley RHODES, Executor of the Estate of Andrew A. Sierra, Deceased, and Farley Rhodes, Individually.
No. 90-CA-0472.
Supreme Court of Mississippi.
September 16, 1993.
*610 Larry L. Lenoir, Kevin J. Necaise, Mize Blass Lenoir & Laird, Gulfport, for appellant.
Robert C. Galloway, Galloway & Galloway, Gulfport, for appellee.
En Banc.
HAWKINS, Chief Justice, for the Court:
This case comes on appeal from the Chancery Court of the First Judicial District of Harrison County, Mississippi, Honorable Harry Grey Walker, Special Chancellor, presiding. At issue was the ownership of the contents of a safety deposit box and savings account, both set up in the names of "Andrew A. Sierra OR Nancy Clay Madden, as Joint Tenants with Right of Survivorship." The Special Chancellor ruled that Madden had not presented the clear and convincing evidence needed to rebut the presumption of undue influence which had been raised. He found that the assets were, therefore, part of the estate of Andrew A. Sierra. That finding is clearly supported by the record before us; and, because it is thus beyond our authority to disturb, as well as for other reasons to be set forth, we affirm.

FACTS
Madden, a thirty-three year old nurse, first met seventy-two year old Andrew Sierra and his wife, Anna, in November, 1987, when Mrs. Sierra was a patient in Garden Park Community Hospital, where Madden was employed. Mrs. Sierra was terminally ill with cancer and became a patient in the hospital's hospice program the next month.[1] That same month, December, 1987, Madden decided to volunteer for the program and she became the Sierras' hospice volunteer.
*611 Anna Sierra was completely bedridden and required care twenty-four hours a day. The Sierras had no children or close relatives living nearby, so Andrew Sierra provided almost all the care for his wife. His only relief was during the times that Madden came and stayed with Anna. Then, Andrew could leave the house to run errands, buy groceries, or go to the bank.
Madden testified that her duties as a hospice volunteer were to visit or call to allow the patient to talk, as well as to give the caretaker time to get out of the house. She went to the Sierra home at least twice a week, staying four to six hours each time. Madden did light housekeeping chores, bathed and cared for Mrs. Sierra, and sometimes gave her medications to her.
During the months that followed, the Sierras gave Madden several gifts, including a mink stole. Madden also gave the Sierras various small gifts and loaned them a microwave oven.
In March, 1988, the Sierras gave Madden a key to their home. They showed her where they kept a hidden cash box, as well as showing her where they kept their important papers. They told her about some of their financial matters, such as Andrew's retirement check; Anna's oil and gas royalty check; their checking account at Hancock Bank; and the safe deposit box and savings account at Southern Federal Bank that they had in their names and that of Farley Rhodes.[2]
In October, 1988, Garden Park Hospital decided to end its hospice program. Madden testified the Sierras were very upset, even though hospital officials assured them they would arrange for a home health agency to take over Anna's care. The Sierras were still anxious and unhappy even after the hospital announced its plan to continue the program until the end of the year. Madden assured the Sierras she would continue to visit them after the termination of the hospice care and their relationship would remain the same.
During this time of uncertainty for the Sierras, on November 14, 1988, Madden took Andrew in her car to Merchants Bank to open a new safety deposit box and savings account in only the two of their names. Madden admitted she drove Andrew to the bank in her car, she suggested they go to Merchants Bank, she had previously banked there, and she knew one of the officers of that bank, Sandy Rogers. Although the Sierras maintained accounts at both the Hancock Bank and Southern Federal Bank, no evidence was introduced that either of the Sierras had ever done any business with Merchants Bank before.
Madden told the trial court the Sierras wanted a new lock box opened in her name to prevent Mrs. Farley Rhodes from having access to any of the valuables in the box at Southern Federal.[3] No explanation was presented of why the Sierras had not simply removed Rhodes's name from the box at Southern Federal, nor why Mrs. Anna Sierra's name was excluded from the accounts opened by Sierra and Madden November 14, 1988, at Merchants Bank.
*612 Madden testified a female bank employee in charge of the safe deposit boxes told her and Sierra they could not rent a lock box unless they already had an account with the bank, so the two of them had to open a savings account. This was disputed, however, by both Carol O'Neill and Linda Taylor, the two employees of the bank responsible for the renting of lock boxes. Both women testified it had never been bank policy to require a customer to have another account with Merchants Bank before renting them a safety deposit box. Richard Matheny, Executive Vice President of Merchants Bank, verified such a policy had never been in effect in the Gulfport branch.
Madden and Andrew Sierra went to the desk of Lisa Jones, one of the bank secretaries, and Sierra told her he wanted to open a savings account. Madden testified Sierra said she was his friend, and she did not recall Sierra's telling Jones why her name was to be on the account. According to Jones, however, Sierra identified Madden as his nurse and he told her he wanted Madden to be able to transact business for him if he should be unable to do it himself.
Jones told Sierra in order for only one signature to be required to withdraw funds from the savings account, the account would have to be set up as an "OR" account. She opened the account in the names of "Andrew A. Sierra OR Nancy Clay Madden."
Jones verified the bank's policy of automatically setting up such "OR" accounts as "joint accounts  with the right of survivorship."[4] She also acknowledged she did not discuss with Sierra the policy of the bank regarding the terms under which the account was established, nor did she discuss the possible disposition of the funds in the account if one of the joint tenants died. The testimony of Jones was uncontradicted.
The evidence also showed Sierra provided all the personal information listed on the document to open the savings account  his address, birthdate, Social Security number, and driver's license number. He did not list any information about Madden, except her name. He also provided one thousand dollars ($1,000.00) in cash as an initial deposit. Both Madden and Jones testified Sierra took the cash from a brown paper bag he had with him.
Sierra and Madden left Jones's desk and went to Linda Taylor's desk near the vault. Taylor, another bank secretary, testified Sierra told her he wanted to rent a safe deposit box and he wanted it set up like the other account, handing her the card completed by Jones. Taylor copied the information from the savings account signature card onto the box rental agreement.
Taylor testified she always set up accounts with more than one name as "joint tenants, with right of survivorship," unless otherwise specified. She stated Sierra did not make any request as to the names on the account, other than his instruction to set it up like the card filled out by Jones. Once again, Taylor confirmed the fact there was no discussion about the terms of the rental agreement, the ownership of the contents of the lock box, nor of why Madden's name was included on the rental agreement and access card.
Sierra and Madden signed the rental agreement without discussion, and Taylor took a box from the vault. She gave it to Sierra, and he took it and the paper bag into a small room near her desk. Madden remained seated by Taylor's desk while Sierra had the box out.
All the evidence confirmed Sierra spoke to no one at the bank that day other than Madden, Jones, and Taylor. Madden said she did not know what Sierra put into the box that day or on any other day and that she was not given a key to the box. No evidence was presented to show Madden ever again took Sierra to Merchants Bank.
Eight days later, on the morning of November 22, 1988, Sierra went alone to Southern Federal Bank. At 10:35 a.m., Sierra signed to gain access to the lock box he and *613 Mrs. Sierra had opened with Farley Rhodes. Then Sierra left and went to Merchants Bank. There he bought two certificates of deposit, one for two thousand dollars ($2,000.00) and one for five thousand dollars ($5,000.00).
Both certificates were prepared by Lisa Jones in the names of "Andrew A. Sierra OR Nancy Madden, WROS."[5] Jones testified she did not discuss the term with Sierra, nor did Sandy Rogers, who signed both certificates. Jones also said Sierra paid with cash. Sierra opened his safe deposit box immediately after he purchased the CDs, at 11:50 a.m.
On November 25, 1988, Sierra went to Southern Federal Bank and gained access to his lock box there for the last time, signing for it at 9:50 a.m. He then went to Merchants Bank and, at 10:10 that morning, he opened his box there. No CD was purchased at Merchants Bank that day, nor was any CD bearing that date found in the lock box.
Madden testified she and her husband had invested in CD's and she had suggested at one time the Sierras do the same. Although Sierra had never bought a certificate of deposit before November 22, 1988, he made five other purchases of CD's during the next two months, all of them from Merchants Bank, and all of them with his and Nancy Madden's name  not his wife's  on them.
On December 30, 1988, Sierra purchased his third CD for three thousand dollars ($3,000.00) in his name and that of Nancy Madden. This time, however, the certificate did not specify "WROS." Again, Sierra paid cash and accessed his safe deposit box after buying the CD.
The very next day, December 31, 1988, Garden Park's hospice program was terminated.[6] Thus, Madden's role as a hospice volunteer officially ended on that date; however, Madden continued to visit the Sierras. In fact, Madden testified that her visits became even more frequent, because Mrs. Sierra's condition was growing much worse.
Sierra bought two more CDs on January 24, 1989, for three thousand dollars ($3,000.00) and two thousand dollars ($2,000.00), and he purchased his last CD on January 31, 1989, for two thousand dollars ($2,000.00). All three certificates were in the names of "Andrew A. Sierra OR Nancy Madden," but without "WROS." On both dates Sierra paid cash and opened his lock box after purchasing the CDs.
All the CDs found in the Merchants Bank lock box were purchased at Merchants Bank; were prepared by either Lisa Jones or Linda Taylor; were signed by either Jones, Taylor, or Sandy Rogers; and had only two names on them  Andrew A. Sierra's and Nancy Madden's. All three bank employees testified they never discussed with Sierra what "WROS" meant, just who legally owned the CDs, nor what would happen to the CDs if Sierra were to die.
Sierra did not gain access to his lock box at Merchants Bank after January 31, 1989. The evidence showed he did not purchase any additional CDs or have any other transactions at the bank after that date. The interest earned on the certificates of deposit bought by Sierra was paid directly into the Merchants Bank joint savings account. Other than the direct interest payments into it, there were no transactions at all related to the savings account Sierra and Madden opened on November 14, 1988.
Madden continued to visit the Sierras frequently after the hospice program was cancelled. She testified Mrs. Sierra was in severe pain and was incoherent at times. On May 25, 1989, Anna Sierra died.
After Mrs. Sierra's death, Madden said she saw Andrew Sierra only a few times. She said he would stop by her house for coffee, and she and her husband had taken him fishing on one occasion.
*614 A little more than two months after Anna Sierra died, on August 3, 1989, Sierra went down and changed the beneficiary on his union burial benefits from the name of Anna Sierra to that of Farley Rhodes.
Three months later, and six months after his wife died, on November 13, 1989, Andrew A. Sierra died unexpectedly. Madden learned of Sierra's death from the obituary column of the local newspaper. She knew he and Rhodes had been good friends, and she called Rhodes.
Rhodes told Madden Sierra had died at home, and they had had to enter the Sierra residence through a window since he had no key. Madden still had her key to the Sierra house, and she agreed to meet Rhodes there to look through their things. Included among the papers at the Sierra's house was Andrew Sierra's will.
Madden testified she glanced over the will and gave it to Rhodes, named by the will as executor of Sierra's estate. Madden showed Rhodes the cash box the Sierras kept hidden beneath the air conditioner; and when Rhodes opened it, they found several thousand dollars in cash, which Rhodes removed.
Rhodes told Madden he had already checked the lock box at Southern Federal Bank, and it was empty; however, he mistakenly believed that was the only safe deposit box the Sierras had. Madden told Rhodes she and Sierra had rented a box at Merchants Bank, and she got the key from the cupboard. She also told Rhodes the Sierras had promised her a silver tea service and some other silverware, and Rhodes got those items and placed them in Madden's car for her. Madden left the Sierra residence, taking the key to the Merchants Bank lock box with her.
A few hours later, after consulting Bob Payne, the attorney for Sierra's estate, Rhodes called Madden at her home. He asked her to meet him at Merchants Bank to check the contents of the box and asked her to bring the key. Madden agreed to meet Rhodes and Payne at the bank around 3:30 p.m.
At 3:29 p.m., Madden signed to open safe deposit box # 311 at Merchants Bank, the box rented in the names of "Andrew A. Sierra OR Nancy Clay Madden." Richard Matheny, one of the bank officers, took the box into a private room and left it with Madden, Rhodes, and Payne.
Madden unlocked the box, which contained several bundles of cash, as well as some certificates of deposit. Some of the bundles of cash were wrapped in what appeared to be plastic bread wrappers. One bundle consisted of three envelopes fastened together by a rubber band. The top envelope had a note, undated but apparently written by Sierra, that said, "Mr. Farley Rhodes has no monety [sic] interest in this box  (signed) Andrew A. Sierra." The other two envelopes in that bundle contained money.
Payne opened each bundle of money and counted it. He also wrote down how much money was in the bundle and then gave it to Madden to count. After Madden verified the amount of money in the bundle, Payne wrapped it up and put it aside. In this way Payne prepared a complete inventory of the contents of box # 311.
After Payne and Madden had counted all the money in the box and written down the amounts of the certificates of deposit, Payne replaced the contents of the box just as they had been before. The completed inventory of box # 311 showed it contained $62,831.90 in cash, as well as six certificates of deposit totalling $17,000.00.
Although it was after 5:00 p.m. when the inventory was completed, Matheny and another bank officer were waiting. They took the box and replaced it in the bank vault. Payne asked Matheny to make copies of the box rental agreement for him and Madden.
After Matheny gave Madden a copy of the agreement, she left the bank, taking the key to box # 311 with her. She talked to her husband about the situation when she got home and then called her brother-in-law, an attorney in Louisiana. The next morning, at the brother-in-law's suggestion, Madden's husband called Bubba Holder, a local attorney, about representing Madden.
Rhodes and Payne stayed at the bank after Madden left with the key and talked with Matheny about the status of the contents *615 of the box. Matheny told them Madden could only be prevented from opening and emptying the box by a court order.
Payne and Rhodes sought the advice of Chancellor William L. Stewart. Payne explained to the chancellor what the names on the savings account and safe deposit box were and about the note in Sierra's handwriting they had found inside the lock box.
After talking to Judge Stewart, Payne prepared a petition for temporary probate and an order for temporary probate by which Rhodes was named temporary executor of Sierra's estate. The chancellor received the petition and order and signed the order at 10:45 p.m.
The order provided Rhodes with temporary letters testamentary. It also required Rhodes, as executor of Sierra's estate, to go to Merchants Bank and, in the presence of bank vice-president Richard Matheny or other qualified officer, to open the safe deposit box. The order stated an inventory of the contents of the lock box was to be prepared and presented to the court.
The next morning, November 15, 1989, Payne and Rhodes took the court order to the bank shortly before 9:00 a.m. Matheny was already there and accepted the order on behalf of the bank.
At 9:00 a.m. when the bank opened for business, Madden and her husband entered the bank and asked to access box # 311, as Holder had advised them to do. Matheny informed Madden the bank was under court order that the box was temporarily the property of Sierra's estate. Matheny gave Madden a copy of the court order.
Although Madden testified, first, that she went to the bank solely for the purpose of getting the note allegedly written by Sierra out of the box to take to her attorney, she later said she planned to remove the cash and place it in an interest-bearing account. Nonetheless, when informed the box was temporarily deemed the property of the estate, Madden did not ask for a copy of the note, nor did her attorney ever make such a request.
The next day, November 16, 1989, Matheny took the key to box # 311 from Madden and opened the box to make an inventory of the contents of the lock box, as the court order required. Present at the inventory session were Richard Matheny, vice-president of Merchants Bank; Rhodes; Galloway, attorney for Rhodes; Madden; Madden's husband; and Holder, attorney for Madden.
Bank personnel made copies of all papers found in box # 311, and Matheny made a second inventory of all the contents of the box. Matheny verified the results of the first inventory and noted the box contained $62,831.90 in cash and six certificates of deposit in the names "Andrew Sierra OR Nancy Madden," worth an additional $17,000.00. Matheny gave copies of the complete inventory results to the attorneys representing both Rhodes and Madden.
After the inventory was complete, Matheny took the contents of box # 311 and placed them in lock box # 79, which was rented in the name "Farley E. Rhodes, Executor of the Estate of Andrew A. Sierra."
The savings account which had been opened by Sierra in his name or that of Madden was found to contain one thousand seven hundred dollars ($1,700.00). This resulted from the original deposit by Sierra of one thousand dollars ($1,000.00) in cash, plus the interest earned on the CDs which had been deposited directly into the savings account.
The total value of the contents of Sierra's safe deposit box and savings account at Merchants Bank was a little more than $80,000.00. An accounting by Rhodes, as executor, showed the total net worth of all other assets of the estate of Andrew A. Sierra outside of Merchants Bank was less than $40,000.00, which included the value of the Sierras' home and automobile.
Madden filed suit on January 19, 1990, in the Chancery Court of the First Judicial District of Harrison County against Rhodes. She demanded the return of the property which she alleged was wrongfully taken from her by him, pursuant to court order on November 15, 1989.
After a three-day trial before a Special Chancellor, a decision was rendered in favor *616 of Rhodes. The chancellor found there was no evidence of mental incapacity on the part of Sierra, nor actual fraud or undue influence on the part of Madden. However, he found there did exist a confidential relationship between Madden and Sierra and facts existed which raised a presumption of undue influence. The chancellor ruled Madden failed to present the clear and convincing evidence required to rebut the presumption. Madden now appeals.

STATEMENT OF THE LAW

Standard of Review
On appeal this Court will not reverse a Chancery Court's findings, be they of ultimate fact or of evidentiary fact, where there is substantial evidence supporting those findings. Cooper v. Crabb, 587 So.2d 236, 239 (Miss. 1991); Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987).
We must consider the entire record before us and accept all those facts and reasonable inferences therefrom which support the chancellor's findings. See Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987); Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983).
The findings will not be disturbed unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or an erroneous legal standard was applied. See Bowers Window and Door Co., Inc. v. Dearman, 549 So.2d 1309, 1313 (Miss. 1989) (citing Culbreath v. Johnson, 427 So.2d 705, 707-08 (Miss. 1983)); Bullard v. Morris, 547 So.2d 789, 791 (Miss. 1989); Johnson v. Hinds County, 524 So.2d 947, 956 (Miss. 1988).
And the chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is to judge their credibility. He is best able to determine the veracity of their testimony, and this Court will not undermine the chancellor's authority by replacing his judgment with its own. See Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987); Hall v. State ex rel. Waller, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963).

I. LEGAL EFFECT OF TERMS UNDER WHICH THE SAVINGS ACCOUNT AND LOCK BOX WERE SET UP AND THE CERTIFICATES OF DEPOSIT WERE PURCHASED.
In a 1951 case, this Court stated:
The general rule of law seems to be that in instances where a joint tenancy has been created by a clear and unambiguous agreement, and the evidence of the existence of a contrary intention is not present, the Courts have held that a true joint tenancy has been created with respect to the contents of a safe deposit box and the surviving tenants become vested with title thereto.
Duling v. Duling's Estate, 211 Miss. 465, 479, 52 So.2d 39, 45 (1951).
The statutes of Mississippi have now abolished the need to prove "intent" in determining ownership of joint accounts. In 1988, the Legislature amended the statutes to expressly state the establishment of any such joint accounts creates an automatic presumption of "intent" to give ownership to the person or persons named on the accounts, whether living or as survivors.[7]
Writing for the Court, Justice Robertson noted in Cooper v. Crabb, 587 So.2d 236, 240 (Miss. 1991), that § 81-5-63 also covers ownership of certificates of deposit issued in two or more names. In addressing the effect of *617 purchasing certificates of deposit as joint tenants, the Cooper Court found the language which stated such certificates were payable to either named person or the survivor was unambiguous. Id. And the Court further stated, "[W]e have never given cause for doubt that we will enforce express survivorship clauses." Id.
Under the rules of law in this state, established both by statute and through case law, then, Madden presumptively held title to the cash and certificates of deposit in the safe deposit box and the cash in the savings account as the surviving joint tenant. Such presumptive title may be defeated, however, upon proof of forgery, fraud, duress, or an unrebutted presumption of undue influence. See Cooper v. Crabb, 587 So.2d 236, 242 (Miss. 1991).
The Special Chancellor found that, absent the unrebutted presumption of undue influence, Madden would have been entitled to the contents of both the savings account and lock box, in their entirety. He rightly recognized the statutorily-created presumption of an intent on Sierra's part to vest title in Madden, although there was uncontradicted testimony Sierra stated at the time he set up the accounts with her name on them that he only did so so she could transact his business in the event he was unable to do so for himself. The chancellor's finding on that point was not in error, insofar as it relates to this case.[8] Our inquiry must turn next, then, to the issue of undue influence.

II. WAS THERE A CONFIDENTIAL RELATIONSHIP BETWEEN MADDEN AND SIERRA?
This Court stated, in Davion v. Williams,
In Croft, and subsequently, the type of confidential relationship for invoking the presumption was broadened to include those of a "moral, social, domestic or merely personal nature. .. ."
Davion v. Williams, 352 So.2d 804, 807 (Miss. 1977) (referring to Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959)).
Hendricks v. James further explained the concept of a confidential or fiduciary relationship:
Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character.
Hendricks v. James, 421 So.2d 1031, 1041 (Miss. 1982) (emphasis added).
The dependency factor was emphasized again when we stated, "[I]n determining whether or not a fiduciary or confidential relationship existed between two persons, we have looked to see if one person depends upon another." In re Will and Estate of Varvaris, 477 So.2d 273, 278 (Miss. 1985).
Madden contends the Special Chancellor erred in finding a confidential relationship existed between her and the Sierras. She argues they were merely friends and their friendship did not rise to the level of a confidential relationship. Such argument does not withstand the most cursory inspection of the record before this Court.
Mrs. Sierra was completely bedridden and totally dependent upon another for all her needs. Andrew Sierra was the primary care-giver to his wife, and his only escape from that heavy burden of responsibility came in the form of Nancy Madden. Only during Madden's visits  usually from four to six hours several times a week  could Andrew Sierra leave the house. With no children to turn to for help, no other close relatives to call upon, Andrew and Anna Sierra were forced by circumstance to turn to Madden for help.
The trust reposed in Madden by the Sierras is evident. The Sierras gave Madden several small gifts; they gave her a key to *618 their house; and they showed her where they kept a hidden cash box. Madden knew what monthly income the Sierras had and when their monthly checks arrived; they told her of their checking account at Hancock Bank; they told her about their savings account and lock box with Farley Rhodes at Southern Federal Bank.
Finally, Sierra opened a savings account, rented a lock box, and bought certificates of deposit  all with Nancy Madden as his joint tenant. Added to this is the fact Sierra trusted Madden, not only to come into their home and their lives, but to care for his wife of more than forty years in his absence.
Madden herself equated her role as a hospice volunteer to that of any other professional person  therapist, licensed practical nurse, registered nurse, minister, doctor, or lawyer. This Court has for many, many years acknowledged the lawyer/client relationship or doctor/patient relationship as a fiduciary one. See, e.g., Hitt v. Terry, 92 Miss. 671, 46 So. 829 (1908); Ham v. Ham, 146 Miss. 161, 110 So. 583 (1926); Gwin v. Fountain, 159 Miss. 619, 126 So. 18 (1930); Dantone v. Dantone, 205 Miss. 420, 38 So.2d 908 (1949); McMahon v. McMahon, 247 Miss. 822, 157 So.2d 494 (1963). We hold the Special Chancellor did not err in finding a confidential relationship existed between Sierra and Madden.

III. ABSENT A FINDING OF ACTUAL UNDUE INFLUENCE OR MENTAL INCOMPETENCE DOES A PRESUMPTION OF UNDUE INFLUENCE ARISE IN THE ESTABLISHMENT OF JOINT ACCOUNTS?
Justice Dan Lee wrote in Costello v. Hall,
The [will] cases in which we have recognized the presumption of undue influence present factual scenarios where there was more than just a legal or domestic relationship between the testator and the beneficiary. There must also be an abuse of that relationship relating to the execution of the will.
Costello v. Hall, 506 So.2d 293, 298 (Miss. 1987) (emphasis in the original).
However, in Croft, the court noted the following:
[T]he rule applied in the case of gifts inter vivos, as by deed, [is] that where a confidential relation exists between donor and donee, it is presumptively void and the burden rests on the donee to produce a clear and convincing evidence that the gift is free from the taint of undue influence... .
Croft v. Alder, 237 Miss. 713, 726, 115 So.2d 683, 687-88 (1959).
The Court went on in Croft, discussing the consequences of transactions between parties in a confidential relationship, to quote from the early case of Ham v. Ham, 146 Miss. 161, 110 So. 583 (1926):
When such a relation exists, and the parties thereto  `consciously and intentionally deal and negotiate with each other, each knowingly taking a part in the transaction, and there results from their dealing some conveyance or contract or gift, ... the principle literally and directly applies. The transaction is not necessarily voidable, it may be valid, but a presumption of its invalidity arises. .. .' 2 Pomeroy Equity Jurisprudence (4th ed.), § 957.
Ham, 146 Miss. at 173, 110 So. at 584.
Thus, the rules of law are different regarding gifts testamentary and gifts inter vivos where a confidential relationship exists between the testator/grantor and the beneficiary/grantee. The prior holdings of this Court indicate a presumption of undue influence only arises in the context of gifts by will when there has been some abuse of the confidential relationship, such as some involvement in the preparation or execution of the will. On the other hand, with a gift inter vivos, there is an automatic presumption of undue influence even without abuse of the confidential relationship. Such gifts are presumptively invalid.
Madden argues that, although this case does not involve a will, the Court should apply the law as it governs testamentary disposition. That is, without an abuse of the confidential relationship, no presumption of undue influence arises. Madden continues that since the chancellor found no abuse of *619 the relationship, she is entitled to the contents of both the savings account and the lock box as a matter of law. Madden's argument is unpersuasive.
It is true that Madden did not choose to exercise control over the assets in the Merchants Bank account and lock box until after the death of Andrew Sierra. That point, however, is irrelevant. Madden's name on the accounts gave her the legal status of co-owner of their contents in the eyes of Merchants Bank, if not of Andrew Sierra, at the time the accounts were opened or the certificates of deposit were purchased. She could have taken possession of all the assets at any time while Sierra and his wife were still living and the outcome would have been the same as if Sierra had made a strict inter vivos transfer to Madden. Had Sierra predeceased his wife, this case would involve Mrs. Sierra and Madden, instead of Rhodes and Madden.
The appropriate standard, then, is that no abuse of the confidential relationship must be proved to raise the rebuttable presumption of undue influence accompanying an inter vivos transfer. Nor do we require a finding of mental incompetence on the part of the grantor to raise the presumption. When a confidential relationship exists, the presumption arises automatically, to be rebutted by clear and convincing evidence presented by the one who wishes to uphold the validity of the gift. See e.g., Hendricks v. James, 421 So.2d 1031, 1043 (Miss. 1982).
While this may appear to be a harsh rule at times, it is also true that the law must protect those who cannot protect themselves.
A finding there was not shown any actual undue influence tells us nothing more than there was no overt action by Madden to take possession of two-thirds of the assets of Anna and Andrew Sierra. Madden was, however, involved in the establishment of the accounts. Such involvement may be classified as implied undue influence by some. It is undue influence, nonetheless.
We can never know what actually transpired between the Sierras and Madden. It is this problem our rule regarding the presumption of undue influence seeks to alleviate. No dispute over the assets arose while Anna and Andrew Sierra were still alive. Anna Sierra could not come before the chancellor to assure him she wished Madden to share their financial assets. Andrew Sierra could not come to testify he set up the accounts, perhaps, to placate his dying wife or to satisfy his fears of being unable to care for their needs at some future date. Only Madden remains to tell us what happened  Madden, the one who would benefit.
This Court wrote in 1910:
It follows, from the very nature of the thing, that evidence to show undue influence must be largely, in effect, circumstantial. It is an intangible thing, which only in the rarest instances is susceptible of what may be termed direct or positive proof. The difficulty is also enhanced by the fact universally recognized, that he who seeks to use undue influence does so in privacy.
Jamison v. Jamison, 96 Miss. 288, 298, 51 So. 130, 131 (1910).
Madden, as the beneficiary of the establishment of the joint accounts, then, must bear the burden of proving, by clear and convincing evidence, the absence of undue influence.
The Special Chancellor did not err in applying the law as it governs gifts inter vivos when a confidential relationship exists.

IV. DID MADDEN PRESENT CLEAR AND CONVINCING EVIDENCE TO REBUT THE PRESUMPTION OF UNDUE INFLUENCE?
The history of our state's law governing the presumption of undue influence began in the case of Meek v. Perry, 36 Miss. 190 (1858). There, this Court held a will or deed from a ward to his guardian raises a presumption of undue influence which can be overcome by the grantee/beneficiary's showing full deliberation on the part of the grantor and abundant good faith on the part of the grantee. Meek v. Perry, 36 Miss. 190, 258-59 (1858).
As early as 1908, this Court addressed the presumption in relation to professionals and *620 gifts from those with whom the professionals had a confidential or fiduciary relationship. We stated in Hitt v. Terry:
[T]he law presumes that, where a will or deed is made by a patient to his physician, to the exclusion of those to whom, ordinarily, his property would go, no reason existing why such exclusion of relations should occur, the law raises the prima facie presumption that the will is void[9] on grounds of public policy; in other words, that in those conditions in life in which confidential relations exist between parties, such as attorney and client, physician and patient, etc., the law presumes deeds or wills made by the client to the attorney, or the patient to the physician, to be prima facie void, and therefore requires such beneficiary under the will to show the absence of undue influence and the like... .
Hitt v. Terry, 92 Miss. 671, 710-11, 46 So. 829, 839-40 (1908) (emphasis added). The Hitt Court referred back to the factors of Meek v. Perry  the showing of full deliberation on the part of the grantor and the abundant good faith on the part of the grantee  to illustrate what evidence would suffice to rebut the presumption of undue influence. Hitt, 92 Miss. 671 at 711, 46 So. 829 at 840 (1908).
In 1926, the case of Ham v. Ham came before this Court. There the Court found that the proof presented to rebut the presumption of undue influence fell short. See Ham v. Ham, 146 Miss. 161, 110 So. 583 (1926). The Court adopted the language of 2 Pomeroy Equity Jurisprudence (4th ed.) § 957, in stating that the presumption could be overcome by clear and convincing evidence of the good faith of the grantee, full knowledge of the grantor, and of independent consent and action of the grantor. Id., 110 So. at 585.
The Ham Court continued:
The usual method of proving independent consent and action in such cases, and probably the only way it can be clearly proven, is by showing that in making the deed the grantor acted on the advice of a competent person disconnected from the grantee and devoted wholly to the grantor's interest. [Citations omitted.]
Ham, 110 So. at 585.
This Court has fluctuated through the years in attempting to find a suitable definition of "independent consent and action" by the grantor. Many cases have relied on the literal words of Ham in defining the third prong of the test. These "independent consent and action" cases were countered by our "independent advice" line of cases. See Justice Robertson's discussion of this dichotomy in Mullins v. Ratcliff, 515 So.2d 1183, 1193-94 (Miss. 1987).
Murray v. Laird, 446 So.2d 575 (Miss. 1984), attempted to settle the issue of the requirements needed to rebut the presumption of undue influence. Murray set forth its interpretation of the Ham three-prong test:
(1) good faith on the part of the grantee/beneficiary;
(2) grantor's full knowledge and deliberation of his actions and their consequences; and
(3) advice of (a) a competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator's interest.
Murray, 446 So.2d at 578.
Only three years later this Court was confronted with another undue influence case, and we changed the statement of the law yet again. In Mullins v. Ratcliff, we re-stated the third prong of the Murray test, declaring that "`independent consent and action' is the appropriate third prong of the test." Mullins v. Ratcliff, 515 So.2d 1183, 1194 (Miss. 1987).
Murray v. Laird is still an important case, however, for it lists factors, gleaned from the common law and years of this Court's case law, which will help dispel the presumption of undue influence. See Murray, 446 So.2d 575 at 578-79.
Madden attempted to prove Sierra's "intentions" that she receive the assets. Where *621 is the proof in this record that  in placing Madden's name on the safe deposit box agreement, opening a savings account, and purchasing savings certificates with her name on them  Sierra intended to make a gift of all of his and his wife's cash assets, over $80,000.00? There is no such proof outside the written language of the deposit agreements.
The bank employees said Sierra's stated intention in placing Madden's name on the accounts was to enable a woman he and his wife trusted to take care of their business in the event he became unable to do so. No one suggested otherwise. No independent person  indeed, not even Madden  came forward with any statement from Sierra that he, in truth, wanted all the $80,000.00 to go to Madden if he died.
It is, of course, now impossible to prove what either Mrs. Sierra or Sierra intended, because they are both dead. It is precisely for this reason the law presumes the gift of this money to Madden, the person the Sierras trusted and depended so heavily upon, resulted from undue influence. The only person on the face of this earth who could shed any light whatever upon the background circumstances in Sierra's making this transfer is Madden  the sole beneficiary.
We are not called upon to try to ascertain Sierra's intentions, nor is Madden called upon to try to prove them. What is required of Madden is to give clear and convincing proof that she showed good faith, that Sierra had full knowledge and deliberation of precisely what he was doing and its consequences, and that Sierra showed independent consent and action. We must look, then, at the evidence presented to the Special Chancellor.

A. DID SHE PRESENT CLEAR AND CONVINCING PROOF OF GOOD FAITH?
Madden described, in detail, the events that took place on November 14. Here, Madden's testimony wears thin. According to Lisa Jones, the Merchants Bank employee, Sierra stated to her, in Madden's presence, that Madden was his nurse and he wanted her name on the account so she could look after his business if he became unable to do it. If Madden had admitted at trial she heard this statement, it would, of course, conclusively show the real purpose of this financial arrangement. It would have conclusively shown the arrangement was only to enable Madden to transact business for Sierra if he was incapacitated  clearly, not to make her a gift of the money.
On the other hand, if Sierra's purpose was to make her a gift of his small fortune, Madden knew she was ethically obligated and bound to say to him, "Mr. Andy, before you do anything like that, you need to talk to someone besides me."[10] Madden gave no such warning, but she escaped confronting this ethical dilemma at trial by testifying she did not recall any such statement.
Madden admitted it would be unethical for her, a registered nurse, to accept gifts of significant value from a patient. As a hospice volunteer, Madden conceded, she performed many of the same kinds of services she had rendered as a nurse for Anna Sierra. Finally, she further admitted she had been instructed, too, that a hospice volunteer could not ethically accept substantial gifts knowingly. Madden never testified that Sierra told her at any time he intended to give her his and Mrs. Sierra's life savings.
Madden took Andrew Sierra in her car to a bank of her own choosing, Merchants Bank, where she had done business before and knew some bank employees, instead of to Hancock Bank or Southern Federal Bank, where he had done business before and was known. Madden said she knew Sandy Rogers and she could talk to him if she ever ran into any trouble; however, Sierra had never met any of the officers or employees of Merchants Bank before. He was a total stranger to them. Thus, Sierra was deprived of the *622 one last chance of having some friend or acquaintance in one of those banks to give him a bare minimum of caution or advice. Madden, the nurse, decided, on her own, to become Madden, the financial advisor.
Madden testified she knew when they set up the accounts on November 14, 1988, they were set up as joint tenancies, with right of survivorship. She admitted she knew that meant she would legally own the contents if Sierra died, even the next day, although Anna Sierra was still alive. Madden also conceded she did not suggest Sierra talk to anyone else  no one at the Merchants Bank, no attorney, no other friend, no relative  before setting up accounts which would, at his death, benefit her, rather than his wife of more than forty years.
Madden  the financial advisor  also admitted on the stand she had suggested to Sierra he invest in certificates of deposit, although he had never done so before; and she said she and her husband had invested in CDs for several years. Madden first denied having any knowledge of the existence of the CDs before Payne opened the lock box; however, she admitted on cross-examination she did know about the CDs before that. Payne, too, testified Madden told him when they first met at Merchants Bank to open the lock box they might find some CDs with her name on them in the box.
Special Chancellor Walker concluded Madden had failed to present clear and convincing evidence of her good faith in these transactions. We concur.

B. DID MADDEN PRESENT CLEAR AND CONVINCING EVIDENCE THAT SIERRA HAD FULL KNOWLEDGE AND DELIBERATION OF HIS ACTIONS AND THEIR CONSEQUENCES?
The undisputed testimony at trial disclosed the fact Sierra did not discuss the consequences of opening the savings account, renting the safe deposit box, nor of purchasing the CDs with Madden listed as his joint tenant with anyone at Merchants Bank. Nor was any evidence presented that Sierra had discussed his actions with anyone, other than Madden's contention that Mr. Sierra had talked it over with Mrs. Sierra.
No credible evidence revealed any knowledge or deliberation by Sierra regarding the disposition of the assets in those accounts upon his death. Madden contended Sierra knew the consequences of his actions because he and Anne Sierra had held their house as joint tenants, with right of survivorship. However, Madden's contention relies on an assumption. Assumptions fall far short of the clear and convincing evidence required.
The evidence in the record implies quite the contrary. For a man to hand over two-thirds of his and his wife's total estate, while his wife of over forty years was sick and confined to her bed defies logic. The chancellor found Madden had presented no clear and convincing evidence on this prong of the test. We agree with the chancellor's conclusion.

C. DID MADDEN PRESENT CLEAR AND CONVINCING EVIDENCE OF SIERRA'S INDEPENDENT CONSENT AND ACTION?
While this Court has modified the Murray requirements of "[a]dvice of (a) competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator's interest," such advice is still clearly the best way to show the "independent consent and action" still mandated by Mullins v. Ratcliff. For what constitutes "independent consent and action?" As we conceded in Murray, we have never set forth any clear definition, nor can we. "Of necessity, each case must be determined individually on its merits." Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984).
Madden presented no credible evidence Sierra ever obtained the advice of any competent person, disconnected from Madden, and devoted wholly to the interest of Sierra, about the questionable transactions. She obviously failed the standard set forth in Murray. More importantly, she failed to meet the standard of Mullins, as well.
Madden argues Sierra showed independent consent and action in several ways. First, Madden contends, Sierra showed it in going *623 to the bank and purchasing CDs without her. Then, she argues, he showed it in changing the beneficiary on his union life insurance policy from Mrs. Sierra to Farley Rhodes. Finally, Madden would have us find independent consent and action in Sierra's renewing the safe deposit box rental under terms identical to the original rental agreement, without removing her name. Madden's arguments are not supported by the record.
The record shows Sierra did not discuss the purchase of the certificates of deposit with anyone, other than Madden. While Sierra did go to the bank alone, Madden herself testified she stayed with Mrs. Sierra while Mr. Sierra ran errands, such as going to the bank. Mrs. Sierra was in no condition to be left alone. And Madden also admitted she suggested the purchase of the CDs and knew of their existence. This shows no independent advice and consent on Sierra's part.
The purchases of the six certificates of deposit were made on three trips to Merchants Bank in a two-month period, beginning November 22, 1988, and ending January 31, 1989. This was within the time frame when the hospice service being provided to the Sierras by the hospital was in the process of termination. Moreover, while Sierra made each of these trips to the bank, on November 22 and December 31, 1988, and January 24 and 31, 1989, Madden was in his home, looking after and caring for Mrs. Sierra.
There is no evidence of Sierra making any effort or having any intention to purchase any certificate of deposit after January 31, 1989. The chancellor could manifestly consider the emotional drain and the mental strain upon this old couple in this critical period of time.
Madden's argument regarding the change in beneficiaries on Sierra's union life insurance policy is also faulty. Life insurance is something about which almost every lay person is somewhat knowledgeable. Also, it may have been the terms of the policy were exhaustively explained to Sierra at the time of purchase. Nonetheless, Sierra's knowing he could name Rhodes as beneficiary of a life insurance policy in no way shows Sierra knew Madden was automatically entitled to three-quarters of all his and his wife's assets. It in no way shows he knew she would get the funds upon his death, nor that he knew she could withdraw them from the bank at any time while he was still living. Again, this is no clear and convincing proof of independent advice and consent.
Finally, in addressing Madden's last contention on this prong, we point out that accepting Sierra's renewal as an indication he "ratified" the account requires us to assume Sierra understood the transaction in the first place. The argument he meant to leave her owning the accounts because he failed to remove her name requires us to examine actions that Sierra did not take in the months following his wife's death. To infer any "independent consent and action" from actions not taken at a later date requires us to ignore the issue before us: Did Madden successfully rebut the presumption of undue influence in the procurement of the accounts and certificates of deposit?
Madden contends the confidential relationship and any possible undue influence by her ended with the death of Mrs. Anna Sierra. This contention ignores the fact that all of the assets in dispute were obtained during the time that Mrs. Sierra still lived, when the confidential relationship and undue influence still existed.
Madden would have us assume failure to negate a transaction equates with ratification of that transaction. Madden would have us assume  and that is all it can be, an assumption  Sierra did not take Madden's name off the accounts because he intended her to have the assets. However, an equally logical, and much more likely, assumption is Sierra simply did not know what he had done.
Fortunately, we are not called upon to make such deductions at all. We do not hesitate to rule, when the evidence warrants, that a will is invalid because it was procured by undue influence. See, e.g., Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959). Our inquiry here, too, must be directed toward the time of procurement.
A search through the case law of all fifty state court systems, as well as all federal courts, has revealed not one single case in *624 which failure to remove someone's name was held to equal ratification of an account set up because of the beneficiary's undue influence. Mississippi will not now set such an unwise precedent. We will recognize the later ratification of actions procured by undue influence only when we are confronted by clear and convincing evidence that ratification is, in fact, intended.
Had Sierra ever stated to an advisor, such as his banker, lawyer, accountant, or even good friend, after Mrs. Sierra's death, "I want to give Mrs. Madden this money; I want her to have it," or had Sierra ever made gifts to Madden after his wife's death, we would have a quite different scenario. This, however, never occurred.
The evidentiary standard required is clear and convincing evidence  not suppositions and assumptions that we, the members of this Court, can somehow know what went on in Andrew Sierra's mind. Instead of relying on clear and convincing evidence, to find in Madden's favor on this point, the chancellor would have had to rely on insinuations, speculations, and assumptions. This he could not do, nor can we.
This Court cannot ignore the fact the Sierras were an elderly couple who had no children during their long marriage. They had only each other. Andrew Sierra was in the tragic position of watching his beloved wife's life slip away before his very eyes while he devotedly cared for her, twenty-four hours a day, with very little respite. Only one who has been in such a situation can appreciate the overwhelming feelings of hopelessness, loss, and utter desolution that result when one of the partners in such a marriage dies.
We cannot say, with any certainty, Sierra knew the legal consequences of his actions when he set up any of the accounts or purchased any of the CDs. We can say with even less certainty he realized the implications after the death of his wife and that he deliberately chose to leave his assets as situated. We cannot be blinded by the unique facts of this particular case when we apply the law.
Counsel asks what Madden did wrong, the same question asked eighty years ago in Jamison v. Jamison, 96 Miss. 288, 51 So. 130 (1910), and answered there and by our decisions since. Once more we state it is not the function of a court, following a gift made by virtue of a fiduciary relation, to go beyond this fact and determine what the beneficiary, the receiver, did "wrong."
To the contrary, it is because the true facts surrounding the gift in such a circumstance are rarely, if ever, susceptible of proof, except from the beneficiary's lips, that the law requires other clear and convincing evidence. The law requires the beneficiary to prove, other than from himself, that the gift was, in truth and in fact, what the giver wished, and not the result of any undue influence or improper action by the beneficiary.
From this record, however, it is clear Madden overstepped her prerogative when she took it upon herself to be the Sierras' financial advisor  a function over and beyond nursing  rather than referring them to someone qualified. She overstepped her prerogative when she drove Sierra to his bank to remove all his assets and transfer them to Madden's bank  rather unusual behavior for a nurse. And, by her own testimony, she did wrong if she ever, in fact, knew during this entire transaction Sierra intended to make her a gift and did not promptly tell him, as she was ethically obligated to do, "Mr. Sierra, you should not give me any large gift unless you talk to someone else you trust, besides me."
It is not now  and never has been  the purpose of the law to frustrate the true wishes of any person to make a gift or devise to whomever he pleases; nor, most assuredly, to prevent the making of a gift to a person to whom he owes a debt of gratitude. Indeed, expressions of gratitude should have every encouragement in law.
But a court of equity has an equal obligation to be certain, in a transfer between parties in a fiduciary relation, that an elderly or weak person is not abused or overreached. There exists a very simple rule which should be observed by any compassionate or considerate person, aside from any rule of law: In the singular event you happen to be in the dominant position in a fiduciary relation and the person dependent upon you tells you he *625 wants to give you his life's savings or property far beyond any sum you may have earned, have the decency to see that he talks to someone besides you.
Put more simply, when a court of equity is faced with a large gift to a dominant party by the weaker in a confidential relation, it must hear from someone besides the beneficiary, or receive clear and convincing evidence beyond that from the lips of the beneficiary, this is, in truth and in fact, what the donor wished to do on his own.
This rule of law can be quite easily satisfied by any conscientious person. It imposes no hardship or difficulty to the expected beneficiary. Yet, it is also the one safeguard against deceit, overreaching, fraud and plunder by a strong person over a weak person, dependent upon him.
Not one person in this case, not even Madden herself, offered a word to indicate Sierra intended to give her his and his wife's lifetime savings. Indeed, as a volunteer, Madden obviously did not expect to be paid for her services; so the rule acts only to deprive her of an unexpected windfall. Had Mrs. Sierra outlived her husband, it would have been an outrage had Madden suggested she was still entitled to the funds. If we do not impose the rule, however, such will be the result in future cases.
The chancellor found Madden presented no clear and convincing evidence that Sierra exhibited independent consent and action in setting up the accounts and purchasing the CDs. The record supports such a finding, and the chancellor did not err.
We wrote in Culbreath v. Johnson:
The trial judge saw these witnesses testify. Not only did he have the benefit of their words, he alone among the judiciary observed their manner and demeanor. He was there on the scene. He smelled the smoke of battle. He sensed the interpersonal dynamics between the lawyers and the witnesses and himself. These are indispensable.
Culbreath v. Johnson, 427 So.2d 705, 708 (Miss. 1983).
Special Chancellor Walker, after "smelling the smoke of battle," concluded Madden had occupied a fiduciary position, was in a confidential relationship with Sierra. He also concluded the presumption of undue influence arose from the mere fact of that relationship's existence. And he finally concluded Madden did not dispel the cloud the presumption of undue influence spread over this dispute.
Special Chancellor Walker, when faced with a situation involving two old people who stood to lose two-thirds of what they had worked a lifetime to accumulate, realized the danger of abandoning the presumption, recognizing the decision in this case will reach far beyond Madden and Rhodes.
The argument Rhodes was no kin to the Sierras and no more entitled to the Sierras' assets than was Madden begs the issue. This Court was not called upon to decide "who should get the money," but to review the findings of the chancellor: to make sure he employed the right legal standard, see he applied it correctly, and determine if his findings were adequately supported by the record before us. We have done so and hold the chancellor's decision was, in all respects, the correct one.
It has also been suggested the rule of a presumption of undue influence in any inter vivos transaction when a confidential relationship exists is too harsh and that it be further weakened or abandoned altogether. This Court cannot stand silently by and see it happen.
Our population is growing increasingly older. More and more of our elderly find themselves separated by great distances from their children or other close relatives. Unfortunately, many of our senior citizens find themselves, like Blanche DuBois, dependent "on the kindness of strangers."[11]
The increase in life expectancy has made it more likely our older citizens will be affected by cancer or other catastrophic illness. And the necessary concerns about rising health care costs make the alternatives of home health care or hospice care attractive ones. *626 In such situations, our elderly are especially vulnerable to those who care for them.
Added to these factors is the abolition of the Dead Man Statute in this state, so that it is easier to make claims of gifts from a deceased person. And the amendment of § 81-5-63 of the Code now raises an automatic presumption of co-ownership in accounts like those at issue in this case.
This latter change in our law reflects concern by many financial professionals over the liability of banks or other financial institutions when handing over funds in joint accounts. While it does clarify their legal position and release them from doubt as to whom to pay, the adoption of such a position has only made a bad situation worse for some of our elderly.
For those who must, for whatever reasons, include someone else's name on their checking, savings, or other accounts, this change represents a greater danger that their entire life savings could be wiped out by an unscrupulous co-tenant. This could happen, without any notice to them at all by their banks, because the law now presumes that any named party is the legal owner of any or all deposits in the joint account.
This Court can never know how many people in this state have placed the names of relatives or friends  including home health nurses  on their accounts, merely for the sake of convenience. There is absolutely no requirement the presumption of ownership such an action raises be explained to the depositor; nor that it be explained putting another's name on their account gives that other person ownership of all the funds at any time  including upon the death of the depositor. Nor must financial institutions explain that, by putting the name of another person on that account, the depositor has just expressly overruled testamentary dispositions of those monies.
In such a legal climate, how can it be argued that the presumption of undue influence places a too harsh burden upon one seeking to claim benefits?
While the vast majority of home-health or hospice workers are, no doubt, honest, compassionate, dedicated professionals, we must guard against the rare grasping opportunist. If such caution makes it slightly more difficult for some of the former to benefit from their kindnesses, it is a small price to pay for the protection of our older adults from the latter.
It would be a very simple matter for one who is going to allow his or her name to be placed on the bank accounts of another person to suggest that the depositor talk to a lawyer, accountant, some bank officer, or even relatives, before doing so. Such an action would not only be evidence of the beneficiary's good faith, but would also show independent advice for the grantor/testator, which we have already said is the best way to prove independent consent and action.
The argument has been made that requiring such proof amounts to requiring beneficiaries to "jump through hoops." However, we do not hesitate to rule a holographic will invalid merely because the testator signed his name at the top of the page; similarly, we require that wills not wholly handwritten by the testator be signed by two witnesses.[12]
If a holographic will is not signed at the bottom, the will is invalid. See Baker v. Baker's Estate, 199 Miss. 388, 24 So.2d 841 (1946). And if a typewritten will is not signed by at least two credible witnesses, it is invalid. See Batchelor v. Powers, 348 So.2d 776 (Miss. 1977).
It matters not that the testator was of sound mind, was of appropriate age, had full knowledge of what properties he owned and of their value, or that he knew who his heirs-at-law were. If a holographic will is not subscribed at the bottom, or if an attested will is not signed by at least two witnesses, it does not matter if witnesses come bearing mountains of affidavits stating that the document expresses the true intentions of the testator. The will is invalid. Under such circumstances, it matters not if the witnesses include dozens of the most honest and clear-thinking *627 men in the community. The wills are invalid.
Some may think our requirement a holographic will be subscribed at the bottom or that an attested will be signed by at least two credible witnesses some "hoop jumping," too.
Nonetheless, we have strictly enforced the statute, and, as a result, we are no longer faced with appeals on the issue. Attorneys throughout the state, and many lay persons, too, know that holographic wills must be signed at the bottom and attested wills must be signed by at least two credible witnesses. Had we been as clear in setting forth our law governing confidential relationships and undue influence and consistent and firm in enforcing that law, that issue, too, would long ago have been settled.
The chancellor's finding that Madden failed to rebut the presumption of undue influence is supported by the record before this Court. We hold the chancellor did not err in finding that, because of the unrebutted presumption of undue influence, Madden was not entitled to the funds in the Merchants Bank savings account, nor to the cash and certificates of deposit in the Merchants Bank lock box.
Madden's other assignments of error do not merit discussion.
AFFIRMED.
DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
McRAE, J., dissents with separate written opinion.
McRAE, Justice, dissenting:
The majority affirms the chancellor's findings that there was neither evidence that Sierra was incompetent nor that Madden had exerted undue influence upon him or committed actual fraud. Yet, the majority further finds, as did the chancellor, that Madden failed to rebut the presumption of undue influence raised by the confidential relationship which existed between Madden and Sierra. I disagree.
Any confidential relationship which existed between Madden and Andrew Sierra ended with the death of his wife, Anna Sierra, on May 25, 1989. From then until Sierra's unexpected death on November 13, 1989, there was almost no contact between the two. Madden testified only that she and her husband took Sierra fishing on one occasion and that he had coffee with them several times. This course of conduct hardly could be described as a confidential relationship or one which would give rise to a specter of undue influence.
During that six month period, Sierra had ample opportunity to change the style on his saving accounts, safe deposit box and certificates of deposit. He changed only the beneficiary on his union burial benefits from his late wife to Farley Rhodes, the executor of his estate. Had he desired to make other changes, he could have done so. We must remember that the evidence supports the chancellor's finding that Sierra was mentally competent until the time of his death.
Whether Madden exerted an undue influence over Sierra between November, 1988 and January, 1989, when the investments styled as Joint Tenants with Right of Survivorship were made, is irrelevant. I am troubled, however, that the majority appears to state that when an undue influence is alleged to have been exerted at some point in time, it is deemed to have continued even after any confidential relationship has ended. Is the majority suggesting that regardless of an individual's mental capacity, the extent of any alleged confidential relationship or the lapse in time since that relationship existed, his failure to rescind any action taken while under a presumptively undue influence renders him bound by that influence? I would hope not. However, had Sierra become incompetent at some time after the investments were made, or even after his wife died, the situation might be different.
In the case sub judice, the evidence suggests that Sierra intended to keep in place the investments he made with Madden designated as a joint tenant. His decision to open the savings account and purchase certificates of deposit as Joint Tenants with Right of Survivorship was tantamount to modifying *628 his will. Moreover, because Sierra left a note in the safe deposit box stating that Rhodes had no interest in its contents, Madden is entitled to receive at least those certificates of deposit styled as Joint Tenants with Right of Survivorship, if not all the contents of the box. I further would find that the chancellor erred in finding that Madden failed to rebut the presumption of undue influence. Sierra's decision not to change the style of the safe deposit box, the certificates of deposit or the savings account after the termination of the alleged confidential relationship is, in and of itself, a clear and convincing rebuttal of any undue influence.
NOTES
[1] A hospice program provides care for terminally ill patients in special facilities or their own homes. Most hospice programs require that a patient have one year or less to live before they can become eligible for the program. The programs provide for trained medical personnel to help care for the patients, as well as volunteers who help in other ways. Hospice programs allow patients to remain with their family members and friends, in familiar, comfortable surroundings until their deaths. Hospice personnel and volunteers give their patients care and support, both physical and emotional.
[2] Rhodes and Andrew Sierra had been close friends since their childhood in the 1930's. After World War II, Rhodes helped Sierra financially and got him a job when he was unemployed.

At some time Mrs. Sierra executed a typewritten will which provided for Andrew to inherit everything upon her death. However, her will further stipulated if Andrew predeceased her, Farley Rhodes would act as executor of her estate and inherit everything as beneficiary.
On March 31, 1983, Andrew Sierra executed a holographic will which was a "mirror" will to his wife's. That is, it stated if his wife survived him, she was to serve as his executrix and inherit everything. If she predeceased him, however, Farley Rhodes was Andrew Sierra's sole beneficiary and executor of his will.
The box at Southern Federal was listed in the names of Mr. and Mrs. Sierra and Farley Rhodes. The Sierras told Madden and others they wanted Rhodes to open the accounts with them so he could transact business for them if they were unable to do so for themselves.
[3] Although Madden stated the Sierras told her they did not want Mrs. Farley Rhodes to have any of their valuables and, so, wanted Madden's name on a lock box, there was no evidence of any wills drafted subsequent to the 1983 wills executed by Anna and Andrew Sierra, whereby they made Farley Rhodes the sole beneficiary of their estates if their spouse had predeceased the testator. Nor was there any evidence introduced that the Sierras revoked the 1983 wills.
[4] Jones testified the only way to accomplish Mr. Sierra's goal of allowing only one signature to authorize withdrawals from the account was to set it up as an "OR" account, which by bank rules was as joint tenants, with right of survivorship. An "AND" account would allow both names to be on the account and would involve no right of survivorship; however, withdrawals from such an "AND" account required the signature of both parties.
[5] WROS  with right of survivorship.
[6] The hospital had originally planned to terminate the program on October 31, 1988; however, because the Sierras were so upset about it, the hospital administrators agreed to postpone closure until December 31, 1988. The program did, indeed, end on December 31, 1988, and Anna Sierra was the only patient remaining in the program at the time.
[7] By statute:

When a deposit has been made or shall hereafter be made in the name of two (2) or more persons, payable to any one (1) of such persons, or payable to any one (1) of such persons or the survivor or survivors, or payable to the persons as joint tenants, such deposit or any part thereof or interest or dividends thereon may be paid to any one (1) of the said persons, without liability, whether one or more of said persons be living or not, and the receipt of acquittance of the person so paid shall be a valid and sufficient release and discharge to the bank for any payment so made. The making of a deposit in such form, or the making of additions thereto, shall create a presumption in any action or proceeding to which either the bank or any survivor is a party of the intention of all the persons named on the deposit to vest title to the deposit and the additions thereto and all interest or dividends thereon in the survivor or survivors. Miss. Code Ann. § 81-5-63 (Supp. 1991).
[8] We do not here address the question of whether or not Madden was an agent of Garden Park Community Hospital by virtue of her position as nurse/employee or hospice volunteer in the hospice program. Nor do we decide whether such an agency relationship could ever preclude one from retaining any of the assets derived as a result of that agency.
[9] Hitt and Meek both classify such transactions as prima facie void. However, this Court has in later years classified them as prima facie voidable. See Hendricks v. James, 421 So.2d 1031, 1043 n. 7 (Miss. 1982).
[10] If a nurse, doctor, lawyer, or other professional is not obligated to make such a statement to patients or clients who propose to transfer their life's savings to him or her, there is no protection for the weak, sick, crippled, and elderly who must depend upon these professionals. Such actions, without warning, would expose these dependent ones to the very real possibility of being wiped out by those unscrupulous few tempted to do so.
[11] Tennessee Williams, A Streetcar Named Desire (New Directions Publishing Corp. 1947).
[12] Section 91-5-1 of the Mississippi Code Annotated tells us that a will, "if not wholly written and subscribed by himself or herself, ... shall be attested by two (2) or more credible witnesses in the presence of the testator or testatrix." Miss. Code Ann. § 91-5-1 (Supp. 1992).