McMILLIN, P.J.,
for the Court:
¶ 1. This case comes before the Court as an appeal from a judgment rendered by the Chancery Court of Simpson County. The case was commenced by the appellants as an injunction suit to halt a pending foreclosure of a real estate deed of trust. The appellees, who were the beneficiaries in the instrument, had commenced foreclosure, not because the appellants had defaulted in payment of the secured debt, but because they believed the appellants had committed waste on the security property. The chancellor found that waste had been committed and that this constituted a breach of a covenant against waste in the deed of trust. However, the chancellor conditionally stayed the foreclosure to permit the appellants an opportunity to rectify the waste by prepaying to the appellees an amount equal to the diminished value of the collateral attributable to the waste. The appellants, dissatisfied with that result, have appealed. We have concluded that certain aspects of the appeal have merit and that the present judgment must be reversed and this cause remanded for further proceedings.
I.
Facts
¶ 2. Jerry and Martha McNeese, the appellants before this Court, purchased a tract of real property in 1988 from George and Jo Ann Hutchinson, the appellees. The purchase price of $53,000 was deferred to be paid by the McNeeses in 212 monthly installments of $250 each. This deferred purchase price was evidenced by a promissory note and was secured by a deed of trust on the property executed by the McNeeses in favor of the Hutchinsons. The deed of trust contained a covenant that the McNeeses would “keep the Property in good repair and shall not permit or commit waste, impairment or deterioration thereof.”
¶ 3. Among other improvements, the property contained a swimming pool that, over *453 time, had deteriorated in condition to the point that, in 1995, it was unusable without extensive repairs. The McNeeses, rather than repairing the pool, elected to fill it in. The Hutchinsons learned of this and, convinced that this action had diminished the value of their collateral by the amount of $7,000, made demand for payment in that amount. The McNeeses failed to respond to the demand and the Hutchinsons commenced a non-judicial foreclosure of the deed of trust as a remedy for this perceived breach of the covenant against waste contained in the instrument.
¶ 4. Prior to the sale date, the McNeeses filed this chancery proceeding seeking to enjoin the foreclosure. They also sought actual damages, punitive damages, and attorneys fees based on a claim that the act of instituting foreclosure was without justification and thus a tortious act. The chancellor issued a temporary restraining order that halted the scheduled foreclosure. The parties then agreed to a trial on the merits at a subsequent date, thereby leaving the issue of the propriety of foreclosure in abeyance. After a hearing on the merits, the chancellor found as a matter of fact that the act of filling up the swimming pool constituted waste and was thus a breach of the deed of trust covenant. He additionally found that the swimming pool had added a value of $2,500 to the security property so that the destruction of the pool had damaged the Hutchinsons’ security position by that sum.
¶ 5. By virtue of that finding, the chancellor concluded that foreclosure was an available remedy to the Hutchinsons. However, exercising his inherent authority to grant equitable relief, the chancellor temporarily stayed the reinstitution of foreclosure proceedings and offered the McNeeses a period of 120 days to pay to the Hutchinsons the sum of $2,500 in addition to those monthly installments regularly due. This additional sum was to be credited as a prepayment on the McNeeses’ installment obligation with the understanding that the credit would be given to the last installments to become due under the note. In other words, if the McNeeses elected to make this prepayment, they would be obligated to continue to pay the regular monthly installments; however, their obligation would end and the debt would be paid in full at the point where ten installments would otherwise have remained under the original terms of the note. In the event the McNeeses did not make this prepayment within the allowed 120 day period, the chancellor ruled that the Hutchinsons would thereafter be free to reinstitute foreclosure.
¶ 6. Though the McNeeses state that they are presenting two issues for review on appeal, one of the issues as drafted by the McNeeses actually raises three separate issues of law. We will, therefore, discuss the matters raised by the McNeeses in four stages.
II.
The Trial Court Erred in Excluding Evidence of Value of the Collateral
¶ 7. There is little doubt that Mississippi law recognizes the concept of waste by a mortgagor and provides a remedy to the mortgagee who has been damaged in his position as a secured creditor by that waste. Bell v. First Columbus Nat’l Bank, 493 So.2d 964, 969-70 (Miss.1986). The issue in this case revolves around the question of whether, on these particular facts, the Hutchinsons could prove that they had, in fact, been damaged by an act of waste to the extent that they were justified in commencing a foreclosure action. Specifically, the first issue involves the question of whether the chancellor wrongly denied the McNeeses the opportunity to present evidence that would have conclusively shown that the Hutchinsons, as secured creditors, were not damaged by the removal of the pool.
¶ 8. The McNeeses sought to present evidence of the fair market value of the collateral after the pool had been filled in. This was an attempt on their part to demonstrate that, even without the swimming pool, their debt to the Hutchinsons remained adequately secured with a comfortable margin of safety. The chancellor refused to permit such evidence to be introduced, asserting that, in his view of the law, an act of waste on the *454 security property was actionable without regard to its effect on the overall value of the collateral and without regal'd to whether the waste increased the risk of loss to the security holder. After the chancellor ruled against admitting the evidence, the McNeeses proffered the testimony of an appraiser that the property, without the swimming pool, had a fair market value of $62,500.
¶ 9. There is no clear answer in Mississippi law to the question raised by the McNeeses. In other jurisdictions, there appears to be a divergence of opinion. The various positions on the question were succinctly set out by the Supreme Court of North Carolina in the 1917 case of Stewart v. Munger & Bennett, Inc., when that court said:
Some authorities hold that the mortgagee is entitled to have restrained any acts of waste by the mortgagor in possession which may diminish the value of the property subject to the lien, while others say that equity will not interfere in such cases, unless the acts complained of are such as may render the property insufficient for the satisfaction of the debt or of doubtful security; while others hold that equity will not interfere, unless the sufficiency of the security is threatened.
Stewart v. Munger & Bennett, Inc., 174 N.C. 402, 93 S.E. 927, 929 (N.C.1917).
¶ 10. According to an annotation of the subject appearing at 48 A.L.R. 1156 a majority of jurisdictions seem to hold that equity will not interfere for every act of waste, but only those that actually place the secured creditor’s position in some measure of jeopardy. The rule that a mortgagee may enjoin every act of waste, no matter the effect it has on the level of security afforded the mortgagee, appears to be the minority position, according to the annotator’s compilation.
¶ 11. This Court is of the opinion that, with some adjustment to provide more precision, the majority rule provides a more equitable result. The remedy of foreclosure for waste, carrying with it the possibility that the mortgagor will lose all of the security property no matter how faithful he has been in paying the secured debt, could produce a harsh result. In the normal debtor-creditor situation, the secured creditor’s sole interest in the collateral is that it provide security to ensure repayment of the debt. The creditor’s interest in seeing that the improvements are maintained in a good state of repair is not based on the possibility that the creditor may, in the future, have the right to the use and enjoyment of the improvements. To that extent, the secured creditor’s interest in preventing waste is different from that of a remainderman or the holder of some other interest in the property that carries with it the right of future possession. Even in the event of default on the debt, the secured creditor has no reasonable anticipation of actual possession and enjoyment of the collateral beyond his right, no different from any other interested bidder, to purchase the property at the foreclosure sale.
¶ 12. The question necessarily arises, therefore, as to what level of security the creditor may reasonably require at any point in the odyssey from the time of creation of the secured debt until its final discharge. In the case of an installment debt, there are a number of things that could occur over the life of the loan that would affect the level of security held by the creditor. Market forces alone may, over time, significantly increase or decrease the value of the collateral. The debtor may make substantial improvements to the property — improvements that were not contemplated at the inception of the loan — that would have the effect of increasing the value of the collateral.
¶ 13. Under the minority rule, these and other factors have no significance if the mortgagor does any act that diminishes the value of.the collateral. By way of example, if a mortgagor constructs a new garage at a different location on his lot so that another, older garage that existed at the creation of the mortgage is no longer useful, the homeowner would, under the minority rule, be unable to remove the old garage without running the risk of having foreclosure proceedings instituted despite the net increase in value of the collateral arising out of his efforts.
¶ 14. The majority rule, or some variation on it, on the other hand, offers some protection from an abuse by the mortgagee of *455 every technical act of waste. If the homeowner had, by his own efforts or expenditures, substantially increased the value of the collateral so that, even after removal of the old garage, the property had undergone a net increase in value, it is difficult to understand what basis the secured creditor would have to complain, and the majority rule acknowledges this fact.
¶ 15. There is no reason to limit this rationale to affirmative acts of improvement by the mortgagor. The same reasoning would seem to apply when, over the passage of time, the value of the collateral had substantially increased by the action of market forces so that the secured creditor enjoyed a level of protection in excess of what he reasonably could have anticipated at the time the transaction was consummated. If, in that situation, the debtor decided to remove some particular improvement from the property, the effect of which would be to diminish the value of the collateral, but not below a level that the secured party could reasonably have expected to exist at the time, there is no compelling reason why this more-than-adequately-secured creditor should be permitted to institute foreclosure.
¶ 16. The issue thus becomes what level of security the secured party ought to be able to demand. This has apparently been a matter of some difficulty for courts in the past. At what point does the creditor cease to be adequately secured? There has long been general agreement that the creditor is entitled to have the security value maintained at a level above that merely equal to the outstanding debt. The Alabama Supreme Court quoted the English case of King v. Smith, 67 Eng. Rep. 99, 101, 2 Hare 239, 243 (Ch. 1843), which discussed the problem and laid down a rather rigid formula that became the general rule in England.
The difficulty I feel is in discovering what is meant by a “sufficient security.” Suppose that the mortgage debt, with all expenses, to be 1,000 pounds sterling, and the property to be worth 1,000 pounds sterling, that is, in one sense, a sufficient security; but no mortgagee, who is well advised, would lend his money unless the mortgaged property was worth one-third more than the amount lent at the time of the mortgage.
Moses v. Johnson, 88 Ala. 517, 7 So. 146, 147 (Ala.1890) (quoting King v. Smith, 67 Eng. Rep. 99, 101 (Ch. 1843)). The Alabama case goes on to accept the English court’s general conclusions, but then rejects the arbitrary rule that the creditor is entitled to security equal to one and one-third of the debt. The Alabama court suggests that the English rule was based on stable land values that prevailed in England, whereas, in America, land values are subject to great fluctuation in value so that a creditor might reasonably demand a higher level of protection in fear of an unanticipated general decline in land values. Id.
¶ 17. In like vein, the Minnesota Supreme Court said that
[the mortgagee] is entitled to have the mortgaged property preserved as sufficient security for the payment of his debt, and it is not enough that its value may be barely equal to the debt. That would not ordinarily be deemed sufficient as security to one whose purpose is to secure payment, and not to become a purchaser of the property at its market value.
Moriarty v. Ashworth, 43 Minn. 1, 44 N.W. 531, 531-32 (Minn.1890).
¶ 18. The Restatement of the Law Third on the subject suggests that foreclosure as a remedy for the debtor’s committing waste is appropriate only “if the waste has impaired the mortgagee’s security.” Restatement (THIRD) OF PROPERTY: MORTGAGES § 4.6(b)(1) (1997). This appears to be something of a variation on the majority rule since the Restatement goes on to define when the security has been “impaired.” By defining in mathematical terms when the security has been impaired, the Restatement’s position has the beneficial effect of removing the subjective question of when the secured creditor’s position has become so eroded by diminution in the collateral value that the creditor’s position can fairly be classed as “doubtful” — a nebulous concept, at best. Under the Restatement’s theory, the parties to a mortgage tacitly agree at the outset upon a level of security to the secured creditor that will be available over the term of *456 the loan. Because of the impossibility of predicting fluctuations in market value, the Restatement takes the position that this agreed level of security is an amount equal to the fair market value of the collateral at the time the property is pledged as collateral. The Restatement then proposes that the measure of “impairment” of the collateral is whether the waste has the effect of reducing the value of the collateral to something less than the initial value of the collateral. Thus, if because of market forces or the addition of improvements by the debtor, the fair market value of the collateral has increased in the intervening period, an act of waste that diminished the collateral value in an amount less than the intervening increase in overall collateral value would not entitle the secured creditor to foreclose. Foreclosure would be inappropriate because, even after the waste, the creditor would be in a better secured position than he had initially contracted to enjoy. On the other hand, if the act of waste had the effect of driving the value of the collateral below what it was when the mortgage was executed, then the debtor’s "role in permitting that erosion in value would be an act of default under the covenant against waste that inflicted actual damage on the mortgagee and would be a legitimate basis to foreclose.
¶ 19. The Restatement then proceeds to compute the actual loan-to-value ratio at the time of the alleged waste as compared to a projection of what the loan-to-value ratio would have been had the loan been paid according to its terms and the collateral maintained its original value. Only if the actual loan-to-value ratio is higher than the projected ratio has there been an impairment of collateral under the Restatement theory.
¶20. We find the Restatement’s analysis helpful; however, we elect to adopt a somewhat simpler approach that does not involve multiple loan-to-value computations to determine if there has been an impairment of the collateral. We, therefore, hold that, where the issue is whether the secured creditor may institute foreclosure because the debtor has committed waste on the collateral property, the rule is that foreclosure will be appropriate only in those cases where the creditor can demonstrate that the waste committed by the debtor had the effect of diminishing the fair market value of the collateral below what it was at the time of inception of the loan.
¶ 21. This necessarily involves proof of the market value of the collateral at two times: first, at the time of creation of the debtor-creditor relationship, and, second, at the time immediately after the waste has occurred. To the extent that the chancellor found such evidence irrelevant, we conclude that he was in error. Therefore, we have determined that this matter must be reversed and remanded for further proceedings involving an investigation into the collateral value determined at the critical times in order to decide whether foreclosure is an appropriate remedy for the Hutchinsons.
¶ 22. However, if that question is ultimately decided against the McNeeses, we are of the opinion that the chancellor was correct in exercising his equitable power to prevent the harsh remedy of foreclosure on the condition that the debtor provide through some alternate means the level of debt security that the creditor was entitled to demand, i.e, by providing a cash prepayment on the debt equal to the diminished value of the collateral occasioned by the debtor’s act of waste. The North Carolina court, in Stewart v. Munger & Bennett, Inc., reached a similar result by holding that the debtor would be permitted to continue a timbering operation, despite the court’s finding that this was an impermissible act of waste of the security property, on condition that the debtor provide a bond as substitute security for the timber that was being harvested from the property. Stewart, 93 S.E. at 930.
III.
Did the Destruction of the Pool Diminish the Collateral Value
V23. The McNeeses argue that the chancellor erred in failing to determine whether the filling of the swimming pool diminished the overall value of the collateral. According to their argument, supported to some extent by proof offered at trial, a swimming pool does not add value to residential property. In theory, this may be a legiti *457 mate argument. If the property’s value is not changed, or is actually enhanced, by the removal of the swimming pool, then it would be true under the rule we adopt that actionable waste has not occurred as to a secured creditor (though the result would probably be different for a remainderman who is entitled to look toward the ultimate use of the improvements themselves without regard to whether they add value to the property). However, our review of the record convinces us that the McNeeses are simply in error in their factual assertion. The chancellor found as a matter of fact that the overall value of the collateral was reduced in the amount of $2,500 by the act of filling in the pool. There was evidence in the record that indicated this figure actually was as high as $7,000 and as low as $1,500. The chancellor sits as fact-finder and, on appeal, his conclusions on the facts may be disturbed only if it appears that they are not supported by the evidence or are otherwise manifestly in error. Madden v. Rhodes, 626 So.2d 608, 615 (Miss.1993). Based on the expert testimony giving the indicated range of figures assessing the economic impact on the collateral’s overall value occasioned by the destruction of the swimming pool, we cannot say that the chancellor was manifestly in error in determining that actual detriment had occurred and that it was an amount between the two extremes testified to at the hearing.
IV.
Failure of the Mortgagors to Permit Repair or Replacement
¶ 24. The McNeeses set out as an issue in their brief that, under the terms of the deed of trust, they should have been given notice and an opportunity to make repairs before foreclosure was commenced. However, they do not offer any argument or provide any citation of authority on the point in the argument portion of their brief. We will not consider issues that are not properly briefed. Terrell v. Mississippi Bar, 662 So.2d 586, 591 (Miss.1995).
V.
The Denial of Attorney’s Fees
¶25. The McNeeses urge that the chancellor erred in denying their request for attorney’s fees for the suing out of the injunction to halt the foreclosure. They argue that they were, to all intents, successful in their suit since the Hutchinsons were demanding the sum of $7,000 to halt the foreclosure whereas it was ultimately established that the substantially lower sum of $2,500 was a sufficient amount to remove any prejudice the Hutchinsons may have suffered by virtue of the swimming pool’s destruction. They cite no authority on the point that attorney’s fees are proper for the successful suing out of an injunction. Mississippi Rule of Civil Procedure 65(c) suggests that attorney’s fees may be proper for a “party who is found to have been wrongfully enjoined or restrained....” M.R.C.P. 65(c). However, that is not the situation we face. It may be that there are instances where the act being enjoined is wilful and malicious and so egregious that attorney’s fees would be an appropriate element of relief to the party suing out the injunction. However, in this case, the McNeeses were neither completely successful in their suit nor did they show that the Hutchinsons’ conduct was malicious or particularly egregious. These matters are left to the sound discretion of the chancellor, and we cannot, on these facts, discover an abuse of that discretion that would warrant the interference of this Court. Thus, the decision to deny attorney’s fees to the McNeeses is affirmed.
¶ 26. THE JUDGMENT OF THE CHANCERY COURT OF SIMPSON COUNTY IS REVERSED AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THE TERMS OF THIS OPINION. COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEES.
BRIDGES, C.J., THOMAS, P.J., COLEMAN, DIAZ, HERRING, HINKEBEIN, KING, PAYNE, and SOUTHWICK, JJ., concur.