JiBYRNES, Judge.
In this suit to recover the outstanding sum on a promissory note and a claim for reimbursement of funds withdrawn from joint accounts in Louisiana and Mississippi, plaintiff, Anne Ashman, the Executrix for the Succession (“Succession”) of Charles Clifton Cantrell (“Cantrell”), appeals a judgment rendered on cross-motions for summary judgment dismissing the action in favor of the defendants, George Oechsner, III (“Oechsner”) and Pat O’Brien’s Bar, Inc. (“Pat O’Brien’s”). We Affirm.
In August 1987 Cantrell sold by credit sale his remaining stock in Pat O’Brien’s to that corporation. Cantrell died on March 23, 1993 at the age of 88 years old. Pat O’Brien’s paid the purchase price of $390,000 partially in $40,000 cash and the balance was represented by a promissory note of Pat *1206 O’Brien’s in the amount of $350,000 with interest at the rate of ten percent per annum until paid. On September 5, 1991 a $100,000 principal payment was made on the note, and all interest due on the note was paid up to August 8,1992.
On August 27, 1992, Pat O’Brien’s made a $50,000 check payable to the order of Cantrell, which was endorsed by Oeehsner and deposited in a First ^National Bank of St. Bernard account which was in the joint names of Cantrell and Oeehsner. A few days later, Oeehsner withdrew the funds from that bank and deposited them into Whitney National Bank account number 41006211, which also was in the joint names of Cantrell and Oeehsner. On September 27,1992, Oeehsner withdrew $50,000 from the Whitney National Bank with a check payable to Oeehsner. Cantrell died in March 1998.
Another account existed at Hancock Bank in Mississippi under account number 03-773-2910 that was in the joint names of Cantrell and Oeehsner, which account contained the deposits of some of the funds paid by Pat O’Brien’s to Cantrell on the promissory note. After Cantrell’s death, Oeehsner withdrew $82,994.49 by cashier’s check from the Mississippi bank account. Oeehsner claims that he is entitled to the funds in the Mississippi account because Cantrell had told Oeehsner that those funds 'should go to Oeehsner at Cantrell’s death. Although Cantrell’s lawyer had written two letters to Oeehsner stating that the funds in the Mississippi account would belong to Oeehsner at Cantrell’s death, the Succession argues that Cantrell was not aware of the existence of the letters and did not authorize his attorney to write them.
In May 1994 the Succession filed suit against Pat O’Brien’s and Oeehsner to rescind the sale of Cantrell’s last 12 percent interest in Pat O’Brien’s, or alternatively, for the balance due on the note subscribed for the purchase price of Cantrell’s last 12 percent interest in Pat O’Brien’s. The Succession claimed that Oeehsner owed the return of $50,000, withdrawn from a Louisiana bank account in the joint names of Cantrell and Oeehsner while Cantrell was living, and that Oeehsner owed $82,994.49, withdrawn by Oeehsner from the Mississippi bank account after Cantrell’s death. The Succession asked for an accounting of the |3funds and requested that those funds withdrawn by Oeehsner be ordered to be delivered to the petitioner.
On November 6,1996 the trial court found that Pat O’Brien’s is not in default on the note dated September 7,1987, and that interest through September 7,1996 is due. By so ruling the trial court held that $100,000 in principal is due on the note together with interest at the rate of ten percent per annum from September 7,1993 until paid. The trial court dismissed the Succession’s claim to rescind the sale of stock by Cantrell to Pat O’Brien’s.
The trial court decreed that the funds in the Whitney National Bank forms no part of the Succession. In its judgment the trial court declared that the Whitney bank account was closed during the life of Charles Cantrell with the knowledge of Cantrell. At the hearing the trial court stated that there is no evidence indicating that Cantrell was not aware of the $50,000 having been placed in his account. The trial court also decreed that the Mississippi bank account is a surviv- or’s account, and that the funds in that account belong to Oeehsner upon the death of Cantrell. The Succession’s appeal followed.
Appellate courts review summary judgments de novo. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730. An appellate court asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. McCrae v. Hankins, 720 F.2d 863, 865 (5th Cir.1983). Procedurally, the court’s task on a motion for summary judgment is determining whether the moving party’s supporting documents— pleadings, depositions, answers to interrogatories, admissions and Uaffidavits — are sufficient to resolve all material factual issues. LSA-C.C.P. art. 966(B).

$50,000 PAYMENT

The Succession argues that Pat O’Brien’s is not entitled to a credit for the $50,000 check endorsed “C. Cantrell per George *1207 Oechsner,” deposited in the St. Bernard Bank, removed to the Whitney Bank, and ■withdrawn by Oechsner. The Succession notes that the record does not show that Oechsner had Cantrell’s power of attorney to endorse checks made payable to Cantrell’s order, and that there is no evidence that Cantrell had knowledge that the $50,000 was deposited into the accounts. The Succession submits that the $50,000 was never delivered to Cantrell.
The Succession notes that in Louisiana funds deposited in a joint bank account remain the property of its original owner and his estate at death, absent an authentic act of donation. Succession of Fralick v. Secretary of Dept. of Revenue, 529 So.2d 159 (La.App. 3 Cir.1988). Under La. R.S. 6:312 a bank is authorized to allow withdrawals by any joint account holders without affecting the ownership of the funds. This law relieves banks of liability in disputes between joint account holders. Washington v. Sabine State Bank & Trust Co., 328 So.2d 809, 812 (La.App. 3 Cir.1976). The right of withdrawal is not tantamount to ownership in Louisiana, and a bank does not have to inquire as to the ownership for one of the joint account holders to withdraw funds.
Cantrell and Oechsner maintained the St. Bernard and Whitney bank accounts jointly. Oechsner’s affidavit states that he withdrew the $50,000 funds from the St. Bernard joint account as well as the Whitney joint account and closed [sthose accounts pri- or to Cantrell’s death. The $50,000 was not part of Cantrell’s estate.
The Succession submits that if the $50,000 were a donation from Cantrell to Oechsner, it was not donated properly by authentic act. Oechsner points out that under La. C.C. art. 1539, a manual gift accompanied by a real delivery is not subject to any formality. The Succession maintains that Pat O’Brien’s failed to meet its burden of proof that the $50,000 check was delivered to Cantrell.
The record contains copies of various cheeks marked “RENT” issued by Pat O’Brien’s to Cantrell. In his affidavit Pat O’Brien’s comptroller and manager, Gerard Engel, stated that Cantrell would request that checks to him would be marked as rent for a building owned by Cantrell across the street from Pat O’Brien’s. The record also provides copies of eight additional Bank of Louisiana checks totaling $77,000 paid by Pat O’Brien’s to Charles Cantrell, after Cantrell had no ownership interest in Pat O’Brien’s. Engel explained that Cantrell never went to the Louisiana banks but checks were cashed without his signature endorsement from the joint accounts, and the money was delivered to Cantrell at his request.
It is undisputed that Cantrell and Oechs-ner were extremely close. They usually and customarily conducted their business together by verbal agreement during the years as friends and business associates. Oechsner explained that he would cash checks and bring them to Cantrell. This is supported by the executrix’s statement that it was' customary for Oechsner to bring cash to Cantrell whenever he requested it. Oechsner asserts that he and Cantrell never had a business argument. There is no evidence of any discord, and there was no antagonistic litigation between the parties. Cantrell did not disapprove of the ^arrangements as he never held Pat O’Brien’s or Oechsner in default of payment, including the $50,000. Cantrell never contested that the $50,000 debt was not paid or outstanding.
Considering the customary manner in which Cantrell and Oechsner carried out their business arrangements, Pat O’Brien’s and Oechsner met their burden of proof by showing that Cantrell never claimed that the $50,000 was overdue and not paid, and over $50,000 was ultimately delivered in cash to Cantrell. The trial court properly granted the motion for summary judgment in favor of the defendants relative to the $50,000 transaction.

$82,99U9 CASHIER’S CHECK WITHDRAWN BY OECHSNER FROM MISSISSIPPI JOINT BANK ACCOUNT AFTER CANTRELL’S DEATH

The Succession contends that it had ownership of the funds in the Mississippi bank account at the time of Cantrell’s death. Oechsner argued that he was entitled to the funds he withdrew from the joint account in *1208 Mississippi because by opening the Mississippi joint bank account, Cantrell had meant for Oechsner to have the funds remaining in the account at the time of Cantrell’s death.
It appears that the Succession should have raised the dispute over the funds in the joint Mississippi bank account during the probation of Cantrell’s will in Mississippi if the Succession believed that those funds were part of Cantrell’s succession. However, the parties do not contest whether the issue should be raised in Louisiana courts. The parties agree that most of the funds deposited into the joint Mississippi bank account were from Pat O’Brien’s in New Orleans, and the remaining funds were withdrawn after Cantrell’s death by Oechsner, who was domiciled in Louisiana and working in New Orleans. Applying Mississippi law, we will review Oechsner’s ownership of the funds withdrawn from the Mississippi |7joint banking account in conjunction with Oechsner’s ownership of the funds withdrawn from the joint banking accounts in Louisiana.
The parties agree that under Mississippi statutory law the funds in a joint bank account are presumed to belong to the surviv- or. See 81-5-63 of the Mississippi Code of 1972. However, the Succession argues that this presumption is defeated on proof of undue influence under Madden v. Rhodes, 626 So.2d 608 (Miss.1993). That appellate court referred to Hendricks v. James, 421 So.2d 1031, 1041 (Miss.1982), which explained the concept of a confidential or fiduciary relationship:
... Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter’s dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character.
Madden, supra, 626 So.2d at 616.
The Madden appellate court stated:
The appropriate standard, then, is that no abuse of the confidential relationship must be proved to raise the rebuttable presumption of undue influence accompanying an inter vivos transfer. Nor do we require a finding of mental incompetence on the part of the grantor to raise the presumption. When a confidential relationship exists, the presumption arises automatically, to be rebutted by clear and convincing evidence presented by the one who wishes to uphold the validity of the gift....
* * * * * *
Madden as the beneficiary of the establishment of the joint accounts, then, must bear the burden of proving, by clear and convincing evidence, the absence of undue influence.
Id. at 619.
That court concluded:
... What is required of [the beneficiary] is to give clear and convincing proof that [the beneficiary] showed good faith, that [the grantor] had full knowledge and ^deliberation of precisely what he was doing and its consequences, and that [the grantor] showed independent consent and action....
Id. at 621.
In that case, Madden, the hospice volunteer, helped Mr. Sierra take care of his terminally ill wife in December 1997. Madden took Mr. Sierra in her car to a bank of her own choosing instead of the two banks where Mr. Sierra had done business before. Madden admitted that she had been instructed that a hospice volunteer could not ethically accept substantial gifts knowingly. Anna Sierra predeceased her husband and both of the Sierras’ wills had declared that a third party, Farley Rhodes, would act as executor and sole beneficiary if one spouse was predeceased by the other spouse.
The appellate court noted that:
Madden testified she knew when they [she and Mr. Sierra] set up the accounts on November 14, 1988, they [the accounts] were set up as joint tenancies, with right of survivorship. She admitted she knew that meant she would legally own the contents if Sierra died, even the next day, although Anna Sierra was still alive. Madden also conceded she did not suggest Sierra talk to anyone else — no one at the Merchants *1209 Bank, no attorney, no other Mend, no relative — before setting up accounts which would, at his death, benefit her, rather than his wife of more than forty years.
Madden — the financial advisor — also admitted on the stand she had suggested to Sierra he invest in certificates of deposit, although he had never done so before; and she said she and her husband had invested in CDs for several years....
Id. at 622.
The appellate court affirmed the trial court’s finding that Madden failed to rebut the presumption of undue influence.
In the present case it is undisputed that Cantrell alone opened and maintained the Mississippi bank account that was in the joint names of Cantrell and Oechsner. |9Cantrell wrote the checks on this account and received the bank statements. While the executrix, Anne Ashman, handled Cantrell’s business operations of his home, including paying his employees, she was not allowed to handle the Mississippi joint bank account which Cantrell established with Oechsner.
In Madden, supra, the hospice volunteer, knowing that it was unethical to accept substantial gifts, took Mr. Sierra to her bank and was present when under her direction he made the transactions for the joint bank accounts and deposit box.
In the present case Cantrell initiated the procedures to open the joint account in Mississippi without Oechsner’s influence. Oechsner did not have greater control or a dominant influence over this account. There is no showing either that Oechsner did not act in good faith or that he used any undue influence. There is no showing that Cantrell and Oechsner were not on equal footing in their business and personal relationship. No fiduciary relationship existed when Cantrell opened up the account on his own volition.
In Madden, Mr. Sierra did not have anyone with whom to consult about the unusual change in his customary habit of banking at two other banks but went with Madden to her bank in her car to open the new joint account.
In the present ease Cantrell had an attorney, Lucien M. Gex, Jr., and the executrix, Anne Ashman, who were aware of his business dealings with Oechsner over many years. Cantrell did not open the Mississippi joint bank account shortly before his death; instead, Cantrell had maintained the Mississippi account for a long period of time. This was not a sudden change in Cantrell’s banking habits right before his death.
Madden does not require a finding of mental incompetence on the part of the grantor to raise the presumption of undue influence. However, in the present case lipthe Succession asserts that Cantrell’s mind was failing. It points to Gex’s affidavit which stated that Gex wrote two letters dated July 7, 1992 and October 20, 1992 to Oechsner, advising that the funds in the Mississippi joint account would belong to Oechsner at Cantrell’s death. Gex stated in his letters that he did not discuss the matter with Cantrell because Gex believed that Cantrell’s mind was failing. Generally it can be inferred that if one’s mind were failing, one could be more easily influenced by a close companion or confidant.
There is no evidence that anyone questioned whether Cantrell’s mind was failing when he signed three codicils to his will, one of which was dated April 24,1992, and two of which were dated April 28, 1992. Cantrell had opened the joint Mississippi banking account long before he wrote the codicils. In the codicils Cantrell left additional sums of money to Emma Halton, Mark Siler, and Mandy Bell Ducksworth, but the codicils did not designate anything to be left to Oechs-ner. Except for Gex’s testimony that he thought Cantrell’s mind was failing, there is no further testimony that anyone questioned Cantrell’s mental capacity. No medical testimony shows that Cantrell did not have the mental capacity to take care of his own affairs. Although there was testimony by the executrix, Oechsner, and Engel that Cantrell accused employees in his home of stealing his cash, there is no testimony that Cantrell or anyone else felt that Oechsner had taken or was trying to take any of Cantrell’s money.
No fiduciary relationship and no abuse of the confidential relationship between Cantrell and Oechsner were proved to raise a *1210 rebuttable presumption of undue influence. Even if there were any inference of a presumption because of Cantrell and Oechsner’s close relationship, Oechsner rebutted any presumption of undue influence by clear and convincing evidence. The evidence does not show luthat Oechsner did anything to place Cantrell solely under Oechsner’s influence, isolated from or out of touch with Cantrell’s attorney, executrix, employees or others. Oechsner was not Cantrell’s daily companion who had direction and control over Cantrell’s daily movements. There is no showing that Oechsner did not act in good faith or that Cantrell did not act independently in his consent and actions.
There is no evidence that, at the time Cantrell opened the joint account, Oechsner was in a “position to exercise a dominant influence upon the other [Cantrell] because of the latter’s dependency upon the former.” Cantrell was a very successful businessman in full possession of his faculties. The fact that he loved Oechsner as a son did not make him dependant upon Oechsner, nor did it create a fiduciary relationship with respect to that account.
The trial court properly found that the Hancock Bank account in Mississippi was a survivor’s account, and that upon the death of Cantrell, the funds in that account belong to Oechsner.
As there are no genuine issues of material fact, the trial court properly dismissed the action on motion for summary judgment in favor of the defendants.
Accordingly, we affirm the judgment of the trial court.

AFFIRMED.