MICHAEL E. KIRBY, Judge.
| jThis appeal arises from the Succession of Letitia Nell Bella (“Ms. Bella”). Sam M. Bella, Jr. (“Sam Bella”), Ms. Bella’s brother, sole surviving heir and independent executor of her estate, filed a petition for damages and writ of sequestration on behalf of the estate against Kathleen Tas-sara (“Ms. Tassara”), Ms. Bella’s caregiver, seeking the return of funds[1] that were on deposit in joint accounts in the names of Ms. Bella and Ms. Tassara at JP Morgan Chase Bank, N.A. (“Chase Bank”), at the time of Ms. Bella’s death. Ms. Tassara filed an answer and reconventional demand, alleging that the funds are hers based on an oral agreement the women made when they combined their separate funds to open the joint accounts in August 2006. Alternatively, Ms. Tassara alleges that, in the event the court determines she does not own the funds, the estate owes her $134,200.00 for 16,775 hours of uncompensated services rendered to Ms. Bella from the date of Hurricane Katrina to her death; approximately $10,000.00 for | ¿funeral and burial expenses; and damages and attorney fees for the wrongful issuance of the writ of sequestration.[2]
*974 Following a trial, the trial court rendered a judgment on August 12, 2010, ordering that $50,000.00 of the funds be returned to Ms. Bella’s estate for disbursement to Sam Bella, and that the stipulated sum of $30,000.00 (Ms. Tassara’s original contribution) and $20,000.00 as a remunerative donation be placed in the possession of Ms. Tassara. Ms. Tassara appeals. For the reasons that follow, we affirm.
Factual Background
Ms. Bella was born with cerebral palsy,, and required assisted-care twenty-four (24) hours a day, seven (7) days a week. Although physically incapacitated, she had no mental deficiency. Ms. Bella resided with her mother, Lorraine Bella, in their family home at 61 Thornton Drive in Chal-mette. After Lorraine Bella died in 2002, Sam Bella renounced his inherited interest in the Thornton Drive home in favor of his sister.
Following Lorraine Bella’s death, Ms. Tassara, a neighbor, became a fulltime caregiver to Ms. Bella and was compensated for her services. In August 2005, as Hurricane Katrina approached, Ms. Bella evacuated to Lafayette with Ms. Tassara. Shortly thereafter, they moved to LaPlace, Louisiana, where they lived with Ms. Tas-sara’s daughter and son-in-law for ten months.
|aIn June 2006, Ms. Bella and Ms. Tas-sara agreed to rent a house and live together in Reserve, Louisiana, near Ms. Tassara’s family. In August 2006, they agreed to open joint savings and checking accounts and a certificate of deposit in both their names at Chase Bank. Ms. Bella deposited $10,000.00 into the checking account, $30,000.00 into the savings account and $60,000.00 into the certificate of deposit while Ms. Tassara deposited $30,000.00 of her own funds into the certificate of deposit. The women agreed that they would pay their rent and other living expenses out of those joint accounts. They further agreed that Ms. Tassara would care for Ms. Bella without compensation to preserve the funds.[3] Finally, they agreed that upon the death of either of them, the funds remaining in the joint accounts would go to the survivor.[4]
Ms. Bella died on December 8, 2007. Ms. Tassara made the final arrangements, paying for the funeral and burial, including the cost of a new crypt, with funds from the Chase Bank joint accounts. After the funeral, Ms. Tassara transferred the remaining funds at Chase Bank into a certificate of deposit in her daughters’ names at Iberia Bank.
14At her death, Ms. Bella left a valid statutory will that bequeathed all of her *975 property to Sam Bella.[5]
Discussion

Assignments of error 1,2, 3 and 5

Collectively, in the first, second, third and fifth assignments, Ms. Tassara contends the trial court erred in ordering that $50,000.00 of the funds from the joint accounts be returned to Ms. Bella’s estate for distribution to Sam Bella. She argues that, given the value of her services, the trial court erred in finding the agreement between the women was not an onerous donation that would have entitled her to the funds remaining in the joint accounts at the time of Ms. Bella’s death. Ms. Tassara claims that the value of her services from the time the women evacuated until Ms. Bella died far exceeded the total funds in the joint accounts on the date of her death. Thus, regardless of whether the agreement is a remunerative donation, as the trial court found, or an onerous one, Ms. Tassara argues she is entitled to either the remaining funds or additional compensation from the estate for her unpaid services.
“In Louisiana, funds deposited into a joint bank account remain the property of its original owner and his or her estate at death, absent an authenticate act of donation.” Succession of Elie, 2010-525, p. 3 (La.App. 3 Cir. 11/3/10), 50 So.3d 262, 265 (citation omitted). The right of withdrawal, or having one’s name listed on the account, is not tantamount to ownership. Id. at 4, 50 So.3d at 265; See also Cantrell v. Pat O’Brien’s Bar, Inc., 97-0545 (La.App. 4 Cir. 1/7/98), 705 So.2d 1205, 1207.
“A donation inter vivos is a contract by which a person, called the donor, gratuitously divests himself, at present and irrevocably, of the thing given in favor of another, called the donee, who accepts it.” La. C.C. art. 1468. “A donation inter vivos shall be made by authentic act under the penalty of absolute nullity, unless otherwise expressly permitted by law.” La. C.C. art. 1541. Regarding onerous donations, La. C.C. art. 1526 provides:
The rules peculiar to donations inter vivos do not apply to a donation that is burdened with an obligation imposed on the donee that results in a material advantage to the donor, unless at the time of the donation the cost of performing the obligation is less than two-thirds of the value of the thing donated.
Regarding remunerative donations, La. C.C. art. 1527 provides:
The rules peculiar to donations inter vivos do not apply to a donation that is made to recompense for services rendered that are susceptible of being measured in money unless at the time of the donation the value of the services is less than two-thirds of the value of the thing donated.
In this case, the trial court found that the depositing of the funds into the joint accounts did not qualify as an onerous donation because Ms. Bella could have accessed the funds at any time prior to her death; thus she failed to divest herself irrevocably of any right she had to the funds contained in the accounts. The court concluded, however, that the same analysis did not apply in the case of a remunerative donation. The court found that at the time the women opened the joint accounts in August 2006, Ms. Tassara had already provided substantial care | ^services for which she had not been compensated, and Ms. Bella intended to com *976 pensate Ms. Tassara by placing the funds in her name. In well-written reasons for judgment, the trial court stated its findings, in pertinent part, as follows:
The placing of the funds into [Ms. Tassara’s] name can qualify as a remunerative donation. The inquiry then becomes the determination of the value of the services which are claimed to have been performed. The value of the services are [sic] to be determined at the date of the donation. However, where the services involved are for the care of a living donor, the courts have assessed the value of services after the fact. Thus, the duration, extent and type of actually performed services are used to determine their value. Averette v. Jordan, 457 So.2d 691 (La.App. 2 Cir.1984). In the case before the Court, the value of the donation is not disputed. Ms. Bella placed a combined $100,000.00 into the joint accounts and/or the certificate of deposit. At the time of this deposit, there was no itemization of value of any care provided by Ms. Tassara for which she had not been compensated. At trial, Ms. Tassara produced an itemization at Exhibit D-2 of the valuation for the case provided by Ms. Tassara. A review of the document sets forth that it covers a claim for continuous payment on a twenty-four hour [basis] from Hurricane Katrina until Ms. Bella’s death. The only period for which payment is not sought is where the State paid for care through Angel’s Touch to either Ms. Tassara or another sitter. It also includes periods for which Ms. Bella and/or Ms. Tassara would have to be sleeping. Further, Ms. Tassara includes the entire period in which Ms. Bella and Ms. Tassara resided with [Ms. Tassara’s daughter’s] family. Absent an exact agreement for the amount of service to be provided daily, the Court would evaluate the services to be for a seventy hour week at $7.00 per hour. For purposes of the remunerative donation, the value of services provided and unpaid prior to the opening of the joint accounts would be $20,000.00 representing a little over a ten-month period. This also takes into account a reduction for the amounts paid by Angel’s Touch over that period and that other family members would have also contributed services.
In this instance, the intended remunerative donation is the actual value of the services performed. It 17is limited to the intent to donate for past services and preserve the remaining funds, and therefore is in excess of two-thirds. No formal Authentic Act is required and the deposit of said funds under Ms. Tas-sara’s name with Ms. Bella constituted a valid remunerative donation of $20,000.00.
A reviewing court may not set aside a trial court’s finding of fact absent manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). After review, we find that the record supports the trial court’s determination that by placing the funds into the joint accounts in Ms. Tassara’s name, Ms. Bella made a remunerative donation with the intent to compensate Ms. Tassara for her past services from the time they evacuated for Hurricane Katrina until they opened the joint accounts. Likewise, we find the evidence supports the trial court’s finding that the value of Ms. Tassara’s past uncompensated services amounted to $20,000.00. Considering the trial court’s reasons, we find no manifest error in its conclusion that Ms. Tassara did not prove her claim to all the funds remaining in the joint accounts at the time of Ms. Bella’s death or her claim for additional compensation from the estate for unpaid services.

*977
Assignment of error í

In the fourth assignment of error, Ms. Tassara alleges that the trial court erred in denying her reimbursement for the funeral and burial expenses. At trial, Ms. Tassara testified that she paid approximately $13,238.65 from the joint ^accounts for Ms. Bella’s funeral and burial expenses and offered into evidence the cancelled checks and the invoices from the funeral home and cemetery.[6]
The record indicates that Ms. Bella had purchased a burial crypt for herself with her separate funds in 2006, and that she allowed the Tassara family to use it to bury Ms. Tassara’s grandson. When Ms. Bella later died, her crypt could not be used so Ms. Tassara purchased a new one with funds from the joint accounts. Under these circumstances, and considering that the monies in the joint accounts were mostly Ms. Bella’s separate funds, we find no error in the trial court’s denial of Ms. Tassara’s claims for reimbursement of the funeral and burial expenses.

Assignment of error 6

Ms. Tassara argues in the sixth assignment of error that the trial court erred by not awarding her damages for the wrongful issuance of the writ of sequestration and the excessive seizure of her funds. She contends that the Sam Bella and the estate had no groxmds to seek a writ of sequestration given Ms. Bella’s agreement with her that the surviv- or was entitled to the remaining funds upon the other’s death. Furthermore, Ms. Tassara claims the seizure of the $90,000.00 certificate of deposit was excessive considering Sam Bella had acknowledged that at least $30,000.00 were her separate funds.
The following Code of Civil Procedure articles are pertinent to the discussion at hand:
Art. 3571. Grounds for sequestration
|flWhen one claims the ownership or right to possession of property, or a mortgage, security interest, lien, or privilege thereon, he may have the property seized under a writ of sequestration, if it is within the power of the defendant to conceal, dispose of, or waste the property or the revenues there from, or remove the property from the parish, during the pendency of the action.
Art. 3501. Petition; affidavit; security
A writ of attachment or of sequestration shall issue only when the nature of the claim and the amount thereof, if any, and the grounds relied upon for the issuance of the writ clearly appear from specific facts shown by the petition verified by, or by the separate affidavit of, the petitioner, his counsel or agent.
The applicant shall furnish security as required by law for the payment of the damages the defendant may sustain when the writ is obtained wrongfully.
Art. 3505. Reduction of excessive seizure
If the value of the property seized under a writ of attachment or of sequestration exceeds what is reasonably necessary to satisfy the plaintiffs claim, the defendant by contradictory motion may obtain the release of the excess.
Art. 3506. Dissolution of writ; damages
*978 The defendant by contradictory motion may obtain the. dissolution of a writ of attachment or of sequestration, unless the plaintiff proves the grounds upon which the writ was issued. If the writ of attachment or of sequestration is dissolved, the action shall then proceed as if no writ had been issued.
The court may allow damages for the wrongful issuance of a writ of attachment or of sequestration on a motion to dissolve, or on a reconven-tional demand. Attorney’s fees for the services rendered in connection with the dissolution of the writ may be included as an element of damages whether the writ is dissolved on motion or after trial on the merits.
|10In the petition for damages and a writ of sequestration, the estate alleged that Ms. Bella left a valid will and testament bequeathing all her property to Sam Bella. It alleged that Ms. Bella had received more than $95,000.00 from State Farm Insurance Company for the damages to her home due to Hurricane Katrina and that she deposited those funds at Chase Bank into joint checking and savings accounts and a certificate of deposit in the names of Ms. Tassara and Ms. Bella. The estate further alleged that at the time of Ms. Bella’s death, there was $16,534.48 in the joint checking account, $9,884.07 in the joint savings account, and $90,000.00 in the certificate of deposit. Most importantly, the estate alleged that shortly after Ms. Bella’s funeral, Ms. Tassara unlawfully liquidated the joint accounts and certificate of deposit at Chase Bank and converted the funds for her own use. Finally, the estate claimed a writ of sequestration was needed because Ms. Tassara had the power to conceal, dispose of, or waste the funds she had unlawfully converted during the pendency of the said action. Based on the verified petition, the trial court issued a writ of sequestration as prayed for on August 19, 2008.
In February 2009, the attorney for the estate learned that Ms. Tassara had placed the disputed funds into a certificate of deposit at Iberia Bank in her daughters’ names. He filed an affidavit and requested the issuance of another writ of sequestration, which the trial court granted on July 20, 2009. Iberia Bank was served with the sequestration order on August 9, 2009. Ms. Tassara sought the dissolution of the writ sequestration by filing a motion for summary judgment, which the trial court effectively denied at the trial on the merits.
^Considering that Sam Bella had verified that Ms. Bella had left a valid statutory will that bequeathed all of her property to him; that she had deposited approximately $100,000.00 of her separate money to fund the Chase Bank joint accounts; that $116,418.55 remained in those accounts on the date of her death; and that Ms. Tassara had liquidated the accounts after Ms. Bella’s funeral, the trial court had sufficient grounds to issue the writ of sequestration in August 2008. Furthermore, the trial court had grounds to issue the second sequestration order based on the affidavit from the estate’s attorney verifying that Ms. Tassara had transferred the disputed funds into the Iberia Bank certificate of deposit in her daughters’ names. Although Sam Bella admitted that Ms. Tassara had deposited $30,000.00 of her own funds into the joint accounts, competing claims to the existing funds and claims for reimbursement were at issue. Thus, we do not find the seizure of the remaining funds was excessive. This assignment of error is without merit.

Assignment of error 7

In the seventh assignment of error, Ms. Tassara argues that the trial court *979 erred by allowing Sam Bella and the estate to execute on the October 4, 2010 order, considering she had taken a suspensive appeal and posted a security bond.
La. C.C.P. art. 2088(A), provides, in pertinent part:
The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and the timely filing of the appeal bond, in the case of a suspensive appeal or on the granting of the order of appeal, in the case of a devolutive appeal. | ^Thereafter, the trial court has jurisdiction in the case only over those matters not reviewable under the appeal, including the right to:
⅝ ⅝ ⅝ ⅛ :js
(7) Execute or give effect to the judgment when its execution or effect is not suspended by the appeal.
The record indicates that the trial court judgment was signed on August 12, 2010, and mailed on August 13, 2010. The deadline for filing a motion for new trial was August 20, 2010. See La. C.C.P. art. 1974. Ms. Tassara did not move for a new trial; thus, the deadline to take a suspensive appeal and furnish security was September 20, 2010. See La. C.C.P. art. 2123 A(l). Because Ms. Tassara failed to perfect a suspensive appeal within the legal delay, the August 12, 2010 judgment became enforceable.
Sam Bella and the estate moved to enforce the judgment, and on October 4, 2010, pursuant to La. C.C.P. art. 2251, the trial court ordered Iberia Bank to release $50,000.00 from the certificate of deposit to Ms. Bella’s estate to satisfy the judgment. Iberia Bank complied with the order by releasing the funds to the estate on October 8, 2010.
On October 14, 2010, Ms. Tassara took a devolutive appeal from the August 12, 2010 judgment, but before the trial court granted the order of appeal, she took a suspen-sive appeal from the October 4, 2010 order and furnished security on October 16, 2010. However, the taking of the suspen-sive appeal had no effect because the underlying judgment had been satisfied when Iberia Bank released the funds, and the order itself was not a final and appealable judgment. See La. C.C.P. arts. 1841 and 2083. If Ms. Tassara wanted to prevent the release of the funds while she appealed the August 12, 2010 judgment, then she had to timely perfect a 1 ^suspensive appeal from that judgment, not the October 4, 2010 order. This assignment of error is without merit.

Appellees’ Assignments of Error

Sam Bella and the estate raise three assignments of error in their appeal brief, seeking to modify the judgment. First, they argue the trial court erred by ordering Ms. Tassara to return $50,000.00, rather than $66,418.55, to the estate, considering the evidence clearly established that $116,418.55 was in the joint accounts on the date of Ms. Bella’s death. Second, they argue the trial court failed to award legal interest. Third, they argue the trial court erred in determining Ms. Bella had made a remunerative donation to Ms. Tas-sara.
We express no opinion on the three aforementioned assignments of error. Because the record indicates that Sam Bella and the estate neither appealed the August 12, 2010 judgment nor answered Ms. Tas-sara’s appeal, we cannot modify the judgment to grant them relief. See La. C.C.P. art. 2133; see also Matthews v. Consolidated Companies, Inc., 95-1925, p. 1 (La.12/8/95), 664 So.2d 1191, 1192.
*980 Decree
Accordingly, for the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED

. The funds included $90,000.00 in a certificate of deposit, $9,884.07 in a savings account and a $16,534.48 in a checking account. After Ms. Bella died, Ms. Tassara transferred the funds to a certificate of deposit at Iberia Bank in the names of her daughters, Peggy Watson and Kathleen Sellers.

. The record indicates the trial court had issued a writ of sequestration ordering the sheriff of St. John the Baptist Parish to sequester all funds in name of Ms. Tassara on deposit at Chase Bank. When the court learned that Ms. Tassara had transferred the funds to a certificate of deposit at Iberia Bank *974 in her daughters’ names, it issued a second sequestration order to sequester those funds.

. The record indicates that Ms. Bella used the $95,000.00 that she had received from flood insurance for the loss of her home to fund the joint accounts. It is undisputed that by August 2005, Ms. Bella had sufficient funds to pay for private health care assistance for another eighteen (18) months, at most. The flood insurance proceeds allowed her to extend that period. When the money was depleted, Ms. Bella would have been placed in a nursing facility. At the time they made the agreement, the women believed that Ms. Bella, age 57, would out live Ms. Tassara, who was 79 years old. Ms. Tassara wanted to contribute $30,000.00 into the joint certificate of deposit and forego being paid for her services to give Ms. Bella additional funds to pay for private health care assistance in the event Ms. Tassara died first. Sam Bella acknowledged that the agreement Ms. Bella and Ms. Tassara made to live together, share expenses and open the joint accounts was to benefit his sister.

. According to the record, Ms. Bella and Ms. Tassara each had a separate checking account.

. The record indicates the Sam Bella was placed in possession and recognized as the owner of the Thornton Drive property by judgment dated March 27, 2008. He subsequently sold the house to the Road Home Program for $66,232.00.

. The record also indicates that Ms. Tassara used $3,000.00 in proceeds from a burial insurance policy, which Ms. Bella had purchased with her separate funds, to defray the funeral and burial expenses.